1 (Pages 1 to 4)

## Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
COLUMBIA DIVISION

-------------------------------------------------------

John William Machin          :
                             :
     Plaintiff     :
                             :
     vs.          : No. 3:12-cv-02675-JFA
Fetter & Son Farms, LLC,     :
Terry J. Weiser, The Andersons, :
formerly known as "Golden Eagle :
Products," and Carus Corporation: :
                             :
     Defendants     :
                             :

-------------------------------------------------------

     The videoconference deposition of SCOTT L.
TURNER, called as an witness at the instance of the
Defendants for use in discovery in the above-entitled
cause, taken pursuant to the Federal Rules of Civil
Procedure, on the 11th day of November, 2013, at the
offices of Continental Film, 1466 Riverside Drive,
Suite E, Chattanooga, Tennessee, before Amye B. Guinn,
Registered Professional Reporter and Notary Public at
Large, pursuant to the stipulation of counsel.


* * * * * *

AMYE B. GUINN, RPR
CERTIFIED COURT REPORTER
39 HONEYSUCKLE DRIVE
ROCK SPRING, GEORGIA  30739
(423) 991-4202

## Page 2

1          I N D E X
2     SCOTT L. TURNER
3        Examination By Mr. Barrow ......................4
4        Examination By Mr. Davison ..................135
5        Re-examination By Mr. Barrow .................171
6        Re-examination By Mr. Barrow .................181
7
8          E X H I B I T S
9     No. 1 Copy of File ..............................186
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

## Page 3

1   APPEARANCES:
2          Appearing for the Plaintiff:
3          Frederick I. Hall, III, Esq.
           The Rick Hall Law Firm, LLC
4          301 Gibson Road
           Post Office Box 1898
5          Lexington, South Carolina  29071
6          Appearing for the Defendant The Andersons
           Formerly known as "Golden Eagle Products":
7
8          Mark S. Barrow, Esq.
           Sweeny, Wingate & Barrow, P.A.
           Post Office Box 12129
9          Columbia, South Carolina  29211
10         Appearing for the Defendant Carus.
           Corporation:
11
12         J. Arthur Davison, Esq.
           Fulcher & Hagler, LLP
           One 10th Street, Suite 700
13         Augusta, Georgia  30901
14   ---------------------------------------------------
15        S T I P U L A T I O N S
16        It being agreed that Amye B. Guinn,
17   Registered Professional Reporter and Notary Public, may
18   swear the witness, report the deposition in machine
19   shorthand, afterwards reducing the same to typewriting.
20        All objections, except as to the form of
21   the questions, are reserved to on or before the
22   hearing.
23        It being further agreed that all
24   formalities as to notice, caption, certificate,
25   transmission, etc.

## Page 4

1        SCOTT L. TURNER,
2   called as a witness, being first duly sworn, was
3   examined and deposed as follows:
4        EXAMINATION
5   BY MR. BARROW:
6     Q    State your full name for me, please.
7     A    **Scott Lee Turner.**
8     Q    All right.  Mr. Turner, my name is Mark
9   Barrow and I represent the defendants, the Andes, f/k/a
10  Golden Eagle Products in a lawsuit that has been
11  brought by Mr. John Machin of whom I understand has
12  retained you as an expert witness in this case; is that
13  correct?
14    A    **That's correct, sir.**
15    Q    All right, sir.  And I have been provided
16  with your CV and report that you have issued in this
17  case.  And, of course, how many times, Mr. Turner, have
18  you given depositions?
19    A    **I'd say approximately 15.**
20    Q    And how many times have you testified in
21  trial?
22    A    **I would say roughly a half dozen.**
23    Q    So the 15 depositions you've given, 12 of
24  those cases ended up with you giving trial testimony?
25    A    **There was trials prior to being an expert,**

2 (Pages 5 to 8)

## Page 5

1  so as far as from an expert standpoint I believe it's
2  been about three or four.
3     Q    When is the last time, Mr. Turner, you
4  testified in trial?
5     A    I would say it was probably about -- I'd
6  have to check my records. I'm not sure which one was
7  the last one I testified in to be quite frank with you.
8  I'd have to check the records on it.
9     Q    Well, has it been during this year 2013?
10    A    I believe it was Connecticut. If I'm not
11 mistaken, it was Connecticut. Again, I'd have to check
12 my records on it, sir. I provided with my documents,
13 my case history, so it should be on there.
14    Q    Good. Maybe I missed that.
15        So you think that trial was this year,
16 Mr. Turner?
17    A    I believe it was January. You know what?
18 I think there was one in Pittsburg that I testified in
19 January if I'm not mistaken.
20    Q    Uh-huh.
21    A    So that may have been it. January or
22 February, sir.
23    Q    All right. The last one you testified in,
24 was that involving a wreck, a truck, tractor trailer
25 accident?

## Page 6

1     A    No, sir. That one was a -- it was a
2  rupture of chemicals in a tank truck at a loading rack.
3     Q    A rupture of chemicals inside the truck did
4  you say?
5     A    Yes, sir. A rupture -- a rupture of -- it
6  was actually a fire that was associated with a rupture
7  on a tank truck, on a cargo tank truck at a loading
8  rack.
9     Q    And did you testify on behalf of the
10 plaintiff?
11    A    Actually, it was a plaintiff/defendant.
12    Q    How long have you been working as a
13 consultant?
14    A    Approximately three and a half years.
15    Q    And of the 15 depositions that you've given
16 are all those as a result of your consulting business?
17    A    Yes, sir. They would all be from
18 consulting. And, again, that was an estimate. It
19 wasn't an exact number. It was an estimate of 15.
20    Q    Sure. Sure. And how many of those were
21 given on behalf of plaintiffs?
22    A    I'm not quite sure, but I can tell you that
23 my caseload is approximately 75/25 or 80 to 20 being --
24 the plaintiff being the weight side.
25    Q    So 80 percent of the cases you are retained

## Page 7

1  on are on behalf of the plaintiff; would that be
2  correct?
3     A    75 to 80 percent roughly, yes, sir.
4     Q    How many open files do you have now,
5  Mr. Turner?
6     A    I would say it's north of 40.
7     Q    Have you ever worked -- have you ever
8  worked for any other lawyers in South Carolina?
9     A    I have. Yes, sir, I have.
10    Q    Give me the names of the lawyers you know
11 of that that you've worked for in South Carolina.
12    A    Bear with me one second. I'll get that to
13 you.
14    Q    Sure.
15    A    Dwayne Green, sir.
16    Q    Where is he out of?
17    A    I don't specifically recall his office
18 address. I believe he's out of -- maybe Columbia.
19    Q    All right. And is he a plaintiff's
20 attorney?
21    A    He is, sir.
22    Q    And is that on open file?
23    A    No, sir.
24    Q    What kind of case was that, Mr. Turner?
25    A    It was a pedestrian fatal involving a

## Page 8

1  commercial motor vehicle.
2     Q    What did you do before you became a
3  consultant?
4     A    Well, I spent years in construction, heavy
5  construction involved with highway building. Several
6  years doing that. Shortly after, when I started
7  entering the workforce on a full-time basis I would say
8  is what would attribute to my expertise. I was a truck
9  driver, over-the-road truck driver, owner/operator. I
10 transported throughout my truck driving years
11 everything from van trailers to cargo tank trucks to
12 low boy heavy hauling equipment. In addition to that,
13 I had spent many years -- I could give you the exact,
14 but many years doing emergency response to hazardous
15 materials incidence. I responded to in excess of well
16 over a thousand incidence myself personally, well over
17 a thousand truck crashes personally, investigated
18 and/or responded to tanker crashes. I would say
19 roughly about 200 tanker incidence and/or crashes over
20 the years. I was an instructor with New Jersey State
21 Police for 11 years during that time ran concurrent
22 during that time instructing cargo tank truck emergency
23 response and dealing with cargo tank truck incidence.
24 And involved with that from time to time we would get
25 involved with pipeline type issues that were associated

3 (Pages 9 to 12)

## Page 9

1  with offloading or cargo tank trucks. Well, that would
2  be about my background as far as my -- as far as my
3  experience is concerned.
4      Q   Let's talk about that a little bit. When
5  you say you were involved in the heavy construction
6  highway building business, tell me a little more about
7  that. What did you do?
8      A   Sure. I worked for a company, actually two
9  different companies over a span of time. Della-Pello
10  was one company. That's D-E-L-L-A - P-E-L-L-O. Then
11  the other firm was Hardroads and they're involved in
12  the business of building heavy highways, so I became
13  very familiar with dealing with gradings and so forth
14  and percentages of slopes and so forth and runoff
15  factors and highway protection systems and so forth.
16      Q   What was your official position with those
17  businesses?
18      A   Supervisor.
19      Q   Of what?
20      A   Supervisor of heavy highway construction.
21      Q   And you were in those businesses for three
22  years?
23      A   Approximately. When I was younger I did
24  it. I was doing heavy construction work for my uncle,
25  so I had a great familiarization with dealing with

## Page 10

1  heavy equipment and asphalt products and so forth.
2      Q   And what happened to that job?
3      A   I got tired of getting laid off during the
4  winter months. Being up in North Jersey at that point
5  you would get into the cold months and they would stop
6  doing paving, so I would get laid off for three or four
7  months a year. I had decided at that point in time
8  that I wanted to get into something that was a more
9  sustainable career, if you will, that would give me
10  full-time opportunities around the clock. I should say
11  12 months. So I got into the hazardous materials
12  dealing with truck crashes, dealing with hazardous
13  materials incidences and so forth.
14      Q   You were a truck driver from '85 to '88?
15      A   Roughly, yes, sir.
16      Q   And did you have a CDL?
17      A   Back then they had -- they didn't have --
18  the CDL laws were not in place. They called them
19  articulated license, so it was an articulated license
20  rather than a CDL.
21      Q   Did you ever -- have you ever had a CDL?
22      A   No, sir.
23      Q   Who did you work for from '85 to '88?
24      A   I worked for myself as an owner/operator.
25  I used to run heavy equipment, again, tank trucks, van

## Page 11

1  trailers, low boy trucks. Low boys meaning heavy
2  equipment hauling. I would contract. I had my own
3  authority back then, and I used to transport for
4  various companies. I used to run over the road out to
5  Broken Bow, Nebraska, and up throughout the New England
6  states delivering heavy equipment.
7      Q   What was the name of your business?
8      A   You know, I believe it was Scott Enterprise
9  Transportation or something like that. It was a long
10  time ago.
11      Q   You don't remember the name?
12      A   Scott Enterprise Trucking or Scott
13  Enterprise Transportation. I ran under the
14  construction company end. It was Scott Enterprise
15  Construction. That's what it was, yes, sir.
16      Q   When you say you ran under the construction
17  end, what do you mean by that?
18      A   Well, during that period of time I was also
19  doing some heavy equipment because I had a low boy
20  trailer. So I was doing some heavy equipment
21  operating, excavating, so I had a couple of pieces of
22  equipment as well. So I was doing excavating
23  contracting in addition to transportation. Then
24  eventually it just became transportation.
25      Q   So you would transport the heavy equipment

## Page 12

1  to a particular site and operate that equipment and
2  excavating for the potential client; is that right?
3      A   In part. In part, but I would also pick up
4  heavy equipment out of the ports and I would transport
5  that heavy equipment out to new buying customers. So,
6  for example, Komatsu heavy equipment, K-O-M-A-S-T-S-U,
7  Komatsu heavy equipment and I would transport that out
8  to -- I was working for a company called Havron
9  Equipment Sales, so I would transport their equipment.
10  In addition, I would transport other people's equipment
11  to locations that they needed transported to. So I
12  would take equipment out of, say, port of New Jersey,
13  New York, and I would transport it up to the new
14  England states or down state or wherever Dean Fry, who
15  was the owner of the Havron Transport, wherever he
16  would contract me to take that particular piece of
17  equipment.
18      Q   Did you ever transport cargo tanks?
19      A   I did.
20      Q   How often?
21      A   That was the least frequent of all of my
22  transportation experience. However, it was -- from
23  being a driver, from a driver's standpoint, that would
24  be the least frequent of all.
25      Q   So would you recall more or less than ten

4 (Pages 13 to 16)

## Page 13

1    tanker trucks?
2        A    More.
3        Q    And who did you haul for?
4        A    I had -- I would transport for various
5    companies that were looking to move liquid waste,
6    whatever it was.  It would be before the regulations
7    kicked in to high gear from ACRA and so far CERCLA,
8    C-E-R-C-L-A, so I would get involved with transporting
9    of various liquids for company's waste waters and so
10   forth.
11       Q    Tell me the names of those companies.
12       A    Oh, sir, you're going back -- you're going
13   back 30 years, 25 years.  I don't recall any of those.
14   They were very infrequent.
15       Q    And did you transport those interstate
16   commerce?
17       A    No, sir.  No, sir.  That was intrastate.
18   It would have been just strictly within the state of
19   New Jersey.
20       Q    So it was dissimilar from the facts that we
21   have in the case before us; is that correct?
22       A    Well, you still have loading and offloading
23   issues, but specifically loading into a PVC system, no,
24   I've never -- I've never pumped off, if you will, into
25   a PVC system.  It would always be carbon steel type

## Page 14

1    bolt flange on type systems.
2        Q    All right.  So why did you leave that
3    business?
4        A    I had a run away truck up in the state of
5    Vermont and it was a real close call.  My son was just
6    born and I just didn't want -- I just didn't want to do
7    that anymore because I wanted to be home as much as I
8    could with my family and still have a working career,
9    so that's why I got into the highway construction.
10   And, again, being laid off for three or four months
11   during the cold seasons was difficult.  So I had
12   decided to get myself into the hazardous materials
13   response arena.
14       Q    Did you ever operate tractor trailers on
15   behalf of any national carriers?
16       A    No, sir.
17       Q    Your CV indicates, Mr. Turner, that in
18   1991 you were an EPS hazardous material disaster
19   response manager?
20       A    Yes, sir.
21       Q    Is that correct?
22       A    Yes, sir.
23       Q    For who?  For who?
24       A    A company called Environment Products and
25   Services.  I used to run their response division.

## Page 15

1        Q    And where are they located?
2        A    They're a defunct company that -- at least
3    I know that the original company's defunct.  It's now
4    down to I believe a couple of the region managers back
5    then, if you will.  Years later they had purchased --
6    there are branches of that company, but it's no longer
7    in its original form.  It's no longer in existence, but
8    they were located back then out of Syracuse, New York.
9        Q    And did you live and work out of Syracuse?
10       A    No, sir.  I lived out of Northwest New
11   Jersey, and I used to run responses for them out of the
12   state of New Jersey getting into the city, New York
13   City that is, Eastern Pennsylvania, southern parts of
14   Pennsylvania and lower New York, upstate New York.
15       Q    So was that a full-time job?
16       A    It was.  More than full-time.
17       Q    When you say "responses," tell me a little
18   more about that.  What did you do on a day-to-day basis
19   for EPS?
20       A    Back then it was responding primarily to
21   hazardous material incidence, be it tank truck
22   rollovers, hazardous materials in the back of trailers,
23   dry van type trailers, dealing with pipeline ruptures.
24   And we used to do some pipeline cleaning as well.
25   Pipeline meaning at facilities, fixed facilities,

## Page 16

1    terminals.  We would do what you call as pigging of
2    lines, maintenance of lines at terminals.
3        Q    Were you responding to EPS's own hazardous
4    incidence or was that a company that was hired by
5    others to respond to a hazardous incident?
6        A    No, sir.  It was a company that was hired
7    out.  It was a hired firm for dealing with hazardous
8    material incidence, so trucking firms, chemical
9    companies, companies like Kinder Morgan, BASF, Dow
10   duPont, et cetera, et cetera.  So fixed facilities.
11   Everything from fixed facilities to transportation of
12   hazardous materials.
13       Q    And you did that for two years?
14       A    Yes, sir.  It was about two years then.
15       Q    What happened to that job?
16       A    I left and went out on my own and started
17   building my own company.
18       Q    What company did you start building,
19   Mr. Turner?
20       A    It's a company HMHTTC Response,
21   Incorporated.
22       Q    And where was that located?
23       A    That was out of New Jersey.  Originally out
24   of Parciffiny, New Jersey, and then we moved it.  When
25   we grew to a considerable size we moved the corporate

5 (Pages 17 to 20)

## Page 17

1  office to Mount Arlington, New Jersey.
2       Q    And were you the owner of that company?
3       A    I was, president and CEO and sole
4  stockholder.
5       Q    And what years did you operate that
6  company?
7       A    I founded it in 1993, and I ran the company
8  up until about three years ago when we chopped it up
9  and sold it off.  We started out in 1993 and I guess it
10  would probably take us into about 2010 roughly.
11      Q    That is not listed on your CV; is it?  No.
12  I see it.  I'm sorry.  1993 to 2009.
13      A    Oh, 2009.  Okay.  I was off by a year.
14      Q    So you owned and operated a fleet of
15  tractor trailers; is that correct?
16      A    That's correct, sir.  Tankers, vans,
17  roll-off trailers, low boy heavy equipment, but a fleet
18  of various size equipment or types of equipment.
19      Q    And how many did you own?
20      A    Nationwide we had -- throughout the years
21  we had 18 offices throughout the country.  I would say
22  that roughly -- and this is -- this is off the top of
23  my head.  I just don't -- I don't recall exactly.  I
24  would say we roughly had about maybe a dozen or so tank
25  trucks, probably more than that.  We probably had about

## Page 18

1  20 to 30 box trucks and van trailers and as far as low
2  boy heavy equipment haulers, we had several drop deck
3  type trailers.  Everything from 50-ton Rogers to
4  tagalongs.
5       Q    And what would your tank trucks haul?
6       A    They would haul everything, anything that
7  was liquid essentially as long as it met the
8  specification under PHMSA, the requirements under PHMSA
9  as for the type of material, the hazards associated
10  with it.  We would transport the liquid.  And,
11  typically, it was in a waste form.  Sometimes it would
12  be in a virgin state depending on the scenario of the
13  crash or the incident.
14      Q    And PHMSA stands for what?
15      A    Pipeline and Hazardous Material Safety
16  Administration.
17      Q    And when you were operating your fleet of
18  tank trucks did you ever have any incidence resulting
19  in a hazardous exposure?
20      A    In all the years that we ran our company I
21  think the only severe injury that we had, if I remember
22  correctly, was a fellow got burned in the face with a
23  steam line.
24      Q    And were you sued?
25      A    No.  It was a workman's comp related

## Page 19

1  matter.
2       Q    How many times were you sued in relation to
3  that business?
4       A    I don't believe that we were ever sued from
5  any of kind of injury, as far as an injury is
6  concerned.  I don't know.  I mean, we had some
7  litigation, of course, but as far as any injuries are
8  concerned, I don't believe we had any either to our
9  folks or anybody as a third-party.
10      Q    Was that a full-time job, Mr. Turner?
11      A    Yes, sir, and then some.
12      Q    All right.  Your CV indicates from '95 to
13  '03 you were employed by the New Jersey State Police,
14  hazardous materials ER technician instructor?
15      A    Yes, sir.
16      Q    Tell me about that job.
17      A    That particular part of it, there was two
18  different -- it ran concurrent with running the
19  company, so it was not a full-time position with the
20  New Jersey State Police.  It ran concurrent with the
21  HMHTTC response.  Essentially what we did in the
22  emergency response technician part of it -- there's two
23  different entities, parts of it, if you will.  There's
24  a tank truck aspect, which I was the lead instructor
25  for, dealing with the cargo tank truck aspect, and then

## Page 20

1  there was the hazardous material technician part which
2  essentially there's -- it's an 80 hour training program
3  and I was one of the instructors that would train
4  personnel on how to respond to hazardous material
5  incidence whether they would be in a tank truck
6  scenario, a pipeline scenario or just a drum in the
7  back of a trailer, chemical fires, plants, explosions,
8  et cetera.  That's the hazardous materials section of
9  it.
10           As far as the specialized training which
11  falls under 29 CFR 1910.120 Paragraph Q, that
12  particular part of the training there, that was for
13  cargo tank truck specialists.  So I would train
14  specialists associated with how to deal with tank truck
15  crashes and/or incidence that are involved with tank
16  trucks regardless of what they may be.  The training
17  itself, that was a 40-hour -- the tank truck aspect was
18  a 40-hour.  The technician was an 80 hour training
19  program.
20           My role in that was training students and
21  the students would range from New York City fire and
22  haz mat to all the haz mat teams throughout the state
23  of New Jersey.  Many of New York State haz mat teams,
24  many Pennsylvania state haz mat teams, Port of
25  Authority, New York and New Jersey haz mat teams, so I

6 (Pages 21 to 24)

## Page 21

1 essentially trained these folks. A lot of folks that
2 were out on 9/11, for example, were trained by me and
3 my counterparts.
4    Q    So that was a part-time job with the New
5 Jersey State Police?
6    A    Yes, sir. As I stated, it ran concurrent
7 with my obligations as CEO of HMHTTC Response,
8 Incorporated.
9    Q    And how many hours a month would you devote
10 to your New Jersey State Police job?
11    A    I would say it was probably somewhere in
12 the neighborhood of about -- on average I would say it
13 was probably in the neighborhood of somewhere around 15
14 to 20.
15    Q    And who was your supervisor or boss, if you
16 will, with that position?
17    A    I really never looked at it that way
18 because I was independent. However, there were two
19 different folks and I'm more than happy to provide you
20 with a letter of verification of this. One is retired
21 now. His name was William McDonald, and then there's
22 another one, Mike Agostiniak (phonetic). Not Mike
23 Agostiniak. I can't recall his last name. Mike
24 something or another, but he runs the unit now and
25 they've outsourced that to an outside contractor now.

## Page 22

1 That's why I no longer do it, but the training itself
2 as far as -- again, I don't recall his last name, but I
3 can get you a copy of the letter where, you know,
4 letter of appreciation from the New Jersey State
5 Police, their gratitude of my years of years.
6    Q    Mr. Turner, as Scott L. Turner Consulting,
7 LLC, am I correct in that what you do primarily is act
8 as an accident reconstruction expert involving
9 commercial motor vehicle accidents?
10    A    That's not exactly accurate, so I guess I
11 can define it a little bit better for you. What I do
12 is as far as accident reconstruction is concerned, I
13 only handle certain aspects of the accident
14 reconstruction itself. I don't get involved with
15 crunch factors and things of that nature, drag
16 factors, et cetera. I do get involved with braking
17 applications on commercial motor vehicles and skid
18 marks as far as making determinations as to what
19 occurred throughout the phases of a crash. I get
20 involved very heavily in the federal regulations under
21 the FMCSR dealing with commercial motor vehicles. I
22 deal with a lot of regulations and standards of care.
23 I deal with a lot of hazardous material related type
24 matters under PHMSA, so a law firm comes to me and asks
25 me questions on these issues and that's the kind of

## Page 23

1 questions I typically field. I also provide some
2 training, some degree of training for trucking firms as
3 far as whether they're carrying hazardous materials or
4 just a transportation company.
5    Q    What trucking firms do you provide training
6 for?
7    A    The primary one that I do training for
8 would be Hermann Transportation. I don't do a lot of
9 training. It's actually -- it's a very, very, very
10 minute part of my revenue, but I do try to build on
11 that a little bit because I do enjoy giving lectures on
12 training. I don't do a whole lot of it currently,
13 though. I'm trying to grow that side.
14    Q    Where is Hermann Transportation located?
15    A    I believe they're out of Dayton, New
16 Jersey, and they're also down in Houston, Texas.
17    Q    Well, when you perform training for them
18 where do you go?
19    A    Both places. I've been to Houston for
20 them. I've been to -- it's a hotel down -- they book
21 all the time down -- I believe it's in the Dayton area,
22 if I'm not mistaken.
23    Q    When's the last time you performed training
24 for Hermann?
25    A    I could tell you just about exactly. Bear

## Page 24

1 with me one second, please. It would have been on
2 April 19th, 2013.
3    Q    All right. Mr. Turner, am I correct that
4 the majority of your consulting is on behalf of
5 commercial motor vehicle -- excuse me, is involved in
6 commercial motor vehicle accidents, wrecks, if you
7 will; is that correct?
8    A    A large portion of it I would agree with
9 that, yes, sir, because there's a lot less hazardous
10 materials out there in the states now comparatively
11 speaking as to, say, 1993 when I was developing my
12 firm.
13    Q    Sure. And I'm just looking at your CV.
14 Correct me if I'm wrong, but it does seem to indicate
15 that a large portion of your work, for example, is
16 specializing in commercial motor vehicle accident
17 investigation that you have investigated well over one
18 thousand tractor trailer wrecks and cargo -- an
19 additional 200 cargo truck wrecks as just as an
20 indication of your experience; is that right?
21    A    That would be correct. And, again, as far
22 as -- well, I refer to them as crashes, but the large
23 majority or the majority of them are trucking-related
24 matters and often in the trucking-related matters you
25 do have hazardous materials involvement and often the

## Page 25

1    tank trucks incidence are involved with hazardous
2    materials. I'm working on a case I just -- I just came
3    in from a case in Houston or, excuse me, down in
4    Southwest Texas on a tank truck related matter, so --
5        Q    Was that a wreck case?
6        A    It was an explosion.
7        Q    Was that a wreck case?
8        A    It was an explosion at a filling facility.
9        Q    And who retained you?
10       A    Bear with me one second. It's not on here
11   because it actually -- that case I started working on
12   after I submitted this report, so it wouldn't be on the
13   log. The attorney's name is however Matt Rosek I could
14   tell you, R-O-S-E-K. And he's up out of Wisconsin and
15   he's working with co-counsel out of Houston, Texas.
16       Q    And who do they represent?
17       A    I'm the defendant on that matter. I have
18   yet to render a report.
19       Q    I'm sorry?
20       A    I have yet to render a report on it, but
21   I'm working for the defendant on that matter. The
22   defendant is C&W Fuel.
23       Q    And that's over the explosion of a tanker?
24       A    It's an explosion at a fueling facility.
25   It wasn't a tank truck. It was a flash fire at the

## Page 26

1    loading -- at the loading track rack. Not the loading
2    rack. Excuse me. At the fueling facility.
3    Essentially when the individual was filling up his
4    diesel saddle tanks on his truck there was a flash
5    fire.
6        Q    And what's your opinion going to be?
7        A    I'm not really at liberty to discuss that
8    opinion on that quite yet. I've not formulated my
9    opinions in totality yet, so I don't think I'm at
10   liberty to discuss it.
11       Q    So when you're performing your services as
12   a consultant in these various wreck cases we just
13   talked about, some of the things that you do as you've
14   indicated is you look at braking and skid marks and
15   overall trying to arrive at an opinion as to cause of
16   the accident itself; is that right?
17       A    Yes, sir, whether it's driver related,
18   whether it's related to somebody driving a car, et
19   cetera, but third-party related, but yes, sir, I do. I
20   do.
21       Q    And part of that, I take it, when you're
22   analyzing skid marks do you reach speed estimates as
23   well?
24       A    Usually going off ECM data on that or
25   taking information from somebody else who would come up

## Page 27

1    with the data from a reconstruction standpoint and
2    utilizing in my formulation or my opinions.
3        Q    What is your educational background,
4    Mr. Turner?
5        A    High school.
6        Q    You have a high school degree?
7        A    Yes, sir.
8        Q    I'm sorry. From where?
9        A    Randolph High School, Randolph New Jersey.
10       Q    And have you ever testified in Federal
11   Court?
12       A    No, sir.
13       Q    Have you ever been named as an expert in a
14   case pending in Federal Court?
15       A    Yes, sir.
16       Q    Take a look at that list for me, if you
17   will, and tell me which cases you've testified in that
18   are in or were in Federal Court?
19       A    I couldn't tell you by looking at this
20   list, sir, which ones are Federal and which ones are
21   not. It's not listed as such.
22       Q    But you've never testified in trial in
23   Federal Court; is that correct?
24       A    No, sir. I can drill down on this and get
25   you a copy at a later point through Mr. Hall.

## Page 28

1        Q    All right. I would like for you to do
2    that.
3            MR. HALL: Can you make a note to do that
4    right now?
5        A    Sure. We actually have drilled down on
6    that as growing pains I would say. I've had that
7    further defined, my case history since this has been
8    submitted.
9        Q    All right. So is ten days enough time for
10   you to get that to Mr. Hall?
11       A    No, sir. It's not going to be and the
12   reason being is that I am completely booked between now
13   and next Thursday, and then my wife and I are going
14   away on a ten-day trip on a cruise to get away for a
15   little bit, so I won't be back until the week of
16   Thanksgiving.
17       Q    How much time do you need? Just tell me.
18       A    End of the month.
19       Q    End of the month. Fair enough. Now, of
20   the approximately 15 depositions that you've given, how
21   many of those were in Federal Court?
22       A    Again, I could not tell you. I just do not
23   recall at this point. And, again, it's an approximate
24   number.
25       Q    Well, let me ask you this: Were any of

8 (Pages 29 to 32)

## Page 29

1  those depositions given in a Federal Court case?
2    A    Yes, they were. To the best of my
3  knowledge, yes, they were, sir.
4    Q    All right. And do you know if any of those
5  cases in which you were retained that were in Federal
6  Court are still active?
7    A    Again, it would go off the list here that I
8  have on here, open and closed, what cases are open and
9  what cases are closed. However, I can't identify
10  specifically which ones are Federal and which ones are
11  not. The new list that we have that I will provide, it
12  does have the actual court case caption on it and also
13  the court venue. And this case here -- excuse me, and
14  this report here was submitted back on July 29th. Some
15  of these cases have been closed out since then.
16    Q    And when did you update this report?
17    A    I would say it -- well, we update it upon
18  request or opinion request or whenever I'm submitting a
19  report as an attachment to the report. So I would say
20  the last time that it was updated was within the last
21  few weeks, last couple of weeks because I know that I
22  submitted some reports.
23    Q    I guess what I'm asking is you told me
24  you've updated this report to indicate the actual case
25  names. When did you first do that?

## Page 30

1    A    We started doing that I would say probably
2  about -- I'm going to say probably about two months,
3  three months ago roughly.
4    Q    Did you provide Mr. Hall with a copy?
5    A    Yes, sir. That's exactly what I'm going to
6  do.
7    Q    No. In the past have you provided him a
8  copy?
9    A    No. No, sir.
10    Q    Have you ever worked for Mr. Hall before?
11    A    No, sir.
12    Q    Do you know how he got your name?
13    A    I have no idea. I would assume the
14  internet or referral.
15    Q    Do you advertise?
16    A    I do on a website.
17    Q    Tell me the name of that website.
18    A    It's Slturnerconsulting.com.
19    Q    Have you ever not been allowed to testify
20  as an expert, Mr. Turner?
21    A    No, sir. No, sir. Oh, excuse me. There
22  was one case up -- there was one case up in
23  Massachusetts actually I was testifying on and that may
24  have been a Federal case as a matter of fact. I'm not
25  sure, but there was a case up in Massachusetts. I was

## Page 31

1  testifying on truck-related matters and standards of
2  care in truck-related matters and there was a leak
3  over, if you will, into OSHA-related issues and the
4  judge just said that he did not want me to testify into
5  OSHA-related matters and that was it. I wasn't barred.
6  It wasn't a Daubert or anything like that.
7    Q    Why did the judge not allow you to testify
8  about OSHA-related matters?
9    A    I quite frankly don't know. I mean, I
10  can -- specifically to the testimony that I was
11  providing, I am an expert on -- I'm not an overall OSHA
12  expert, if you will, but if you come into industrial
13  trucks, for example, under 1910-178, 1910.178, that I'm
14  certainly an expert in. If you come into 1910.120, I'm
15  certainly an expert in that. I consider myself to be
16  highly knowledgeable in 1910.1200. So those areas in
17  particular because there's a lot of crossover into
18  transportation-related issues, I consider myself to be
19  an expert by all terms.
20    Q    All right. What was the name of that case?
21    A    Will you bear with me a second, please?
22    Q    Sure.
23    A    If you look, sir, on that record that was
24  provided to you there is the case history on this as
25  far as the venues. As far as the venues are

## Page 32

1  considered, I mean, it says Superior Court of
2  Massachusetts, Essex, Salem Superior. Superior Court
3  of New Jersey, Sussex County, so there is a list on
4  this that I provided, that my office provided that
5  tells you the venues of these cases.
6    Q    Okay. I see it.
7    A    All right. Bear with me one second.
8    MR. HALL: Wait a minute. He's trying to
9  finish answering your question about what case he
10  wasn't allowed to talk about I guess some subject
11  matter.
12    Q    Right. That's what I'm waiting on.
13    A    It was Kevin DeMello back in 2011, Attorney
14  Kevin DeMello, D-E-M-E-L-L-O, and it was back on
15  4/28/2011.
16    Q    And I take it you were representing the
17  plaintiff in this case?
18    A    Yes, sir.
19    Q    Are you doing anything else, Mr. Turner,
20  other than the consulting business you're currently
21  engaged in?
22    A    Yes, sir. I'm a rancher as well.
23    Q    And where is that located?
24    A    My primary location is up in Northeast New
25  Jersey. We have a cow/calf operation, Black Angus

## Page 33

1  cattle.
2      Q    Is that a full-time job?
3      A    Both of them together I work about 80 hours
4  a week, so I guess one could consider both of them
5  being quasi full-time, but 70, 80 hours a week I work,
6  so -- I also do have a small operation down in East
7  Tennessee up in Spencer.
8      Q    What is that?
9      A    The same thing.
10     Q    Cattle?
11     A    Yes, sir.
12     Q    Do you own that operation?
13     A    I do.
14     Q    Your CV also indicates, Mr. Turner, that
15  you've inspected many commercial motor vehicles for
16  road worthiness as required by the FMCSA; is that
17  correct?
18     A    Yes, sir.
19     Q    That's not an issue in this case; is it?
20     A    Unless other information comes forward at a
21  later point, I don't see it as being a primary issue,
22  no, sir.
23     Q    Right.  And there was no vehicular accident
24  in this case; is that correct?
25     A    That's correct.

## Page 34

1      Q    All right.  Mr. Turner, tell me generally,
2  if you will, what you reviewed -- well, first, tell me
3  when you were contacted in this case.
4      A    I would have to take a look.  Give me one
5  second.  Oh, I'm sorry.  Here it is.  It would be
6  approximately 10/16/2012.
7      Q    And how were you contacted?
8      A    By phone.
9      Q    By Mr. Hall?
10     A    Yes, sir.
11     Q    And what did he tell you about this case?
12     A    Essentially that he had a client that was
13  severely injured as a result of a rupture of a
14  chemical.  At that point I don't believe he said in
15  specificity as to what the chemical was, but it would
16  be later revealed through documents that were forwarded
17  to me.
18     Q    Did he explain to you how the rupture
19  occurred?
20     A    Briefly, yes, sir.  I don't like to get --
21     Q    And what did he tell you?
22     A    I don't like to get too much into details
23  because I like to make opinions on my way.
24     Q    Sure.  What did he tell you?
25     A    I basically cleared out any issues of

## Page 35

1  conflict, then we went on to discuss a generalization
2  of what occurred and specifically back in 2012, I
3  can't -- I cannot verbatim tell you what the
4  conversation was.
5      Q    You didn't make any notes?
6      A    No.  One thing I'm very cognizant of, I
7  don't take notes and the reason I don't is because they
8  get produced at a later point.  I do highlighting, so
9  if you look at any of my -- any of the documents that
10  have been provided to you they would have been
11  highlighted and the highlights and I flagged the pages
12  and I used those flags and highlights in order to be
13  able to compile my -- or alter my report.
14     Q    Mr. Turner, how much are you charging for
15  your time?
16     A    I believe it's $300 an hour.
17     Q    And how much have you been paid to date?
18     A    I don't know specifically offhand exactly
19  what it is.
20     Q    Give me an estimate, if you don't mind.
21     A    I would say maybe it's -- maybe it's
22  $10,000 north or south of that minus deposition fees.
23         MR. HALL:  Oh, by the way, Mark, I had to
24  pay his fees today because y'all didn't submit them, so
25  I'll be billing you guys for that.

## Page 36

1         MR. DAVISON:  Rick, let me just interject
2  something at this moment if I may.  I think in your
3  answers to interrogatories you stated that Mr. Turner
4  was getting 375 an hour.  Was that mistake?
5         MR. HALL:  I have no idea.
6      A    Sir, 375 is deposition fee rate.  $300 an
7  hour is my standard general rate.
8         MR. DAVISON:  Okay.  Thank you.
9      A    You're welcome.
10     Q    (By Mr. Barrow) What is your rate for trial
11  testimony, Mr. Turner?
12     A    Three seventy-five an hour.
13     Q    And what else do you plan on doing in this
14  case?
15     A    If additional document -- well, I do intend
16  on going back and reading more in depth the engineering
17  report as well as David Patton's deposition testimony
18  of which I had very limited time to really look at
19  those documents, but I do plan on looking at them more
20  in depth to see what else is in there, but I did review
21  them from a cursory standpoint last evening.
22     Q    All right.  Let's have the understanding,
23  if you will, that if you -- in reading or looking at
24  any other material whatsoever, if you change your
25  opinions or you find material that adds to your

| Page 37 |
|---|
| 1   opinions will you please let us know because we may |
| 2   need to resume your deposition to find out how your |
| 3   opinions are affected by what other information you |
| 4   gleaned after this deposition.  Is that fair? |
| 5       **A**   **Absolutely.** |
| 6       Q   All right.  So after you were first |
| 7   contacted, what did you do?  What did you request from |
| 8   Mr. Hall? |
| 9       **A**   **Essentially, if you look at the list on my** |
| 10   **report, there's a comprehensive list that would show** |
| 11   **all documents that have been reviewed by me and that** |
| 12   **would be the extent of it.  So if you look at page 13** |
| 13   **of my report it has --** |
| 14       Q   Thank you. |
| 15       **A**   **-- a list of documents reviewed.** |
| 16       Q   Very well.  When were those documents |
| 17   provided to you?  Was that all initially or sometime |
| 18   interspersed throughout the course of this case? |
| 19       **A**   **Predominantly they were issued initially,** |
| 20   **but there were some documents that had come forth at a** |
| 21   **later point in time.  I couldn't identify for you which** |
| 22   **are which at this point in time.** |
| 23       Q   All right.  So you were initially contacted |
| 24   on October the 16th, correct -- |
| 25       **A**   **If that's what I said earlier, I believe it** |

| Page 38 |
|---|
| 1   **was.** |
| 2       Q   -- 2012? |
| 3         And you would have been told something |
| 4   about the accident by Mr. Hall; correct? |
| 5       **A**   **Yes, sir.** |
| 6       Q   And he would have indicated to you that he |
| 7   was seeking your expertise in offering opinions in this |
| 8   case; correct? |
| 9       **A**   **That's correct.** |
| 10       Q   All right.  And he would have told you a |
| 11   little something about it, and then what's the next |
| 12   thing that you looked at after you had this |
| 13   conversation with him? |
| 14       **A**   **Well, it would have been documents that** |
| 15   **have been provided by Mr. Hall.  I can't** |
| 16   **specifically --** |
| 17       Q   All right.  That's what I'm trying to find |
| 18   out. |
| 19       **A**   **I cannot specifically identify for you,** |
| 20   **sir.  As I said earlier, I can't tell you document 1,** |
| 21   **2, 5, 9, 10.  I just could not decipher which I looked** |
| 22   **at first, which I looked at second, third and fourth** |
| 23   **and what came in a month later.** |
| 24       Q   Sure. |
| 25       **A**   **I just don't know.** |

| Page 39 |
|---|
| 1       Q   Do you keep billing records? |
| 2       **A**   **Yes, sir, but it doesn't specifically --** |
| 3   **it's not broken down to specificity as to what I looked** |
| 4   **at that particular day.** |
| 5       Q   Mr. Turner, we don't have a copy of your |
| 6   billing records.  Would you provide a copy to Mr. Hall |
| 7   today so that he can get us a copy? |
| 8       **A**   **I sure will.  Sir, is it fair enough to get** |
| 9   **that to you at the same time with the other document** |
| 10   **you're looking for as well?** |
| 11       Q   I thought since you were there today maybe |
| 12   it would be easy for you just to hand them to you |
| 13   today.  Is that not possible? |
| 14       **A**   **I can have them e-mailed.  I can have them** |
| 15   **e-mailed down.  I don't have them with me.** |
| 16       Q   That would be great. |
| 17       **A**   **I don't have them with me.** |
| 18       Q   E-mail would be great. |
| 19       **A**   **Okay.** |
| 20       Q   Your billing records, Mr. Turner, I take it |
| 21   they would reflect the dates and the time that you |
| 22   would have worked on matters in this case; is that |
| 23   correct? |
| 24       **A**   **That's correct.** |
| 25       Q   And they would show, for example, the |

| Page 40 |
|---|
| 1   receipt of various documents and/or materials from |
| 2   Mr. Hall's office; correct? |
| 3       **A**   **Not necessarily.  What it would say is --** |
| 4   **it would say simple phraseology such as documents --** |
| 5   **begin reviewing documents, for example.  It wouldn't** |
| 6   **say begin reviewing documents, read, you know, a** |
| 7   **specific deposition or something like that.** |
| 8       Q   And would it also reflect the dates that |
| 9   you had conversations with Mr. Hall? |
| 10       **A**   **Not necessarily, unless it was extended** |
| 11   **conversation.  If it's a five-minute conversation I** |
| 12   **don't bill for that.  If it's a half-hour prolonged** |
| 13   **conversation, sure, then I would bill for it.** |
| 14       Q   If it was a conversation about your |
| 15   opinions on this case would you agree that that |
| 16   conversation would be reflected on your billing record? |
| 17       **A**   **Not necessarily, no, sir.** |
| 18       Q   All right.  So you might have given him |
| 19   opinions that aren't reflected in the billing records? |
| 20       **A**   **No.** |
| 21       MR. HALL:  Object to the form. |
| 22       **A**   **Yeah.  That's not what I'm saying.  What** |
| 23   **I'm saying is that the billing records are not broken** |
| 24   **into specificity of what specifically a conversation** |
| 25   **was.  It would just say conference call with R.H., Rick** |

## Page 41

1    **Hall.**
2        Q    I understand that.  You indicated to me
3    that if it was a conversation that lasted five minutes
4    or less it wouldn't be noted on your billing record;
5    correct?
6        **A    That's correct, typically speaking.**
7        Q    My question to you was if it was a
8    conversation in which you expressed opinions that
9    you're going to render in this case, that conversation
10   even if it's not noted in great detail, would be
11   reflected on your billing record because it would be
12   more than five minutes; wouldn't you agree?
13       **A    No, because we could be talking about other**
14   **issues in relation to the matter, not necessarily**
15   **opinions.  It may or may not.  It may or may not be**
16   **opinions.  I just -- I don't break down my billing**
17   **again into specificity that way.**
18       Q    All right.  When did you first indicate to
19   Mr. Hall that you could help him?
20       **A    After I reviewed the initial documents**
21   **after he -- essentially what happens when counsel --**
22   **any law firm contacts me, I don't automatically just**
23   **take the case on.  I require a signed retainer**
24   **agreement, and then what I'll do is I'll take a look at**
25   **the documents and if I feel like I can help, then I**

## Page 42

1    **keep moving forward.  If I feel I can't help them, I**
2    **contact them and let them know that if it's a defense**
3    **matter they may want to highly consider settling or if**
4    **it's a plaintiff matter, yes, I believe that there's**
5    **cause here to move forward.**
6        Q    Sure.  And that's what I'm trying to find
7    out.  You talked to him on the phone first on October
8    the 16th, and what's the -- what would be the next item
9    your billing record would indicate in terms of your
10   work on this case?
11       **A    Review documents, begin reviewing**
12   **documents.**
13       Q    All right.  When would that occur?
14       **A    Whatever the billing records are going to**
15   **reflect, sir.**
16       Q    All right.
17       **A    If it came in -- sometimes a law firm has a**
18   **hot issue and they need a report two weeks from now so**
19   **they'll overnight it.  Some law firms may send it**
20   **three, four days regular mail.  It all depends on a**
21   **particular matter.**
22       Q    How much was your retainer agreement?
23       **A    I charged -- back then I usually charged**
24   **ten hours upfront.  Now, I charge 12 hours upfront on**
25   **my standard rate.**

## Page 43

1        Q    So that would have been $3,000?
2        **A    Yes, sir.**
3        Q    All right.  So after you received the
4    $3,000, you would then begin looking at documents; is
5    that fair?
6        **A    That's correct.**
7        Q    Do you recall if the documents from
8    Mr. Hall came in to you along with the retainer check?
9        **A    I would think that usually that's the way**
10   **it works with plaintiff cases.  Defense cases, because**
11   **the check is typically coming from the carrier, it may**
12   **be -- it may be three, four weeks after the fact.**
13       Q    And it would have been -- because you're
14   taking the retainer agreement and you're reviewing the
15   documents, that initial group of documents that you
16   reviewed you would have then indicated to Mr. Hall that
17   you believe you could help him in the case; would that
18   be accurate?
19       **A    Yes, sir.**
20           MR. HALL:  Objection to the form.
21       Q    Now, tell me what initial group of
22   documents you would have received from Mr. Hall?
23       **A    Again, I said earlier is that I cannot tell**
24   **you.  I cannot break down for you I received Item 1, 2,**
25   **5, 7, 9.  I could not break it down for you and tell**

## Page 44

1    **you which was received when.**
2        Q    Let's take a look at page 13 of your report
3    that has the documents reviewed.
4        **A    Yes, sir.**
5        Q    And maybe this will help refresh your
6    memory.  Under Item 1, it says, "First amended
7    complaint, negligence personal injury."  Do you think
8    that would have come in with the retainer check?
9        **A    I would say it would have.**
10       Q    And then No. 2, "Second amended complaint,
11   negligent personal injury."  Do you believe that also
12   would have come in with the retainer check?
13       **A    Very probable.**
14       Q    All right.  Now, there's a list of
15   depositions here.  John Machin, would that have come in
16   with the initial retainer check?
17       **A    You'd have to look at the dates of the**
18   **retainer -- of the depositions to see if it was**
19   **either -- if it was a month and a half prior to the**
20   **date of the report, then I would say that it probably**
21   **did come in with it.  If it's post report date, then I**
22   **would say that it was likely -- more obviously it would**
23   **have been a deposition that came in after the fact.  So**
24   **I can't break it down for you in specificity.**
25       Q    I understand.  And I appreciate that.

## Page 45

1 Since you had a conversation with him on October the
2 16th, I take it, it would have been fairly soon in time
3 that you would have received the retainer check.
4    A   I would assume that it would --
5    Q   Would you agree with that?
6    A   I would assume it would have been within a
7 week if I recall.
8    Q   And as to the deposition transcripts of
9 Freivolt, Holston, Niderkohr, Walter, Wittenauer and
10 Myers, do you remember if any of those would have come
11 in with the initial retainer check?
12    A   Sir, I don't, but I would think that they
13 likely had.
14    Q   And those are all the documents reviewed
15 listed -- no. Sorry.
16    A   You're missing Ellisor.
17    Q   That's all on page 13.
18    A   Right.
19    Q   Let's go to page 14. We left a whole page
20 out there.
21    A   Sir, you didn't mention -- you did not
22 mention Ms. Ellisor either which is on that --
23    Q   No. I haven't turned the page yet. Just
24 hang with me, Mr. Turner. We're getting there.
25    A   Yes, sir.

## Page 46

1    Q   Now, looking at page 14 under the documents
2 you reviewed, the deposition transcript of Mary
3 Ellisor, did that come in with the initial check?
4    A   Again, sir, I don't recall specifically
5 what documents came in on the initial package. I
6 just -- I could not break it down for you.
7    Q   All right. So looking at the documents you
8 reviewed 10 through 26, you can't tell me if any of
9 those documents came in with the initial retainer
10 check?
11       MR. HALL: Objection to the form.
12    A   Once again --
13    Q   You can answer.
14    A   Once again, I cannot decipher for you what
15 came on the initial package and what came in at a later
16 point. I just cannot break it down for you in
17 specificity.
18    Q   I understand. I appreciate that. I'm
19 trying to find out if reviewing this helps refresh any
20 of your memory. So what you're telling me then I take
21 it, Mr. Turner, is that looking at the documents you
22 reviewed in your report you cannot tell me other than
23 the first and second amended complaint if any of these
24 documents would have come in with the initial retainer
25 check; is that correct?

## Page 47

1       MR. HALL: Objection to the form.
2    Q   You can answer.
3    A   I would agree with that.
4    Q   Now, if I looked at your billing statement
5 and it says, "Documents reviewed," is there any
6 specificity in that statement as to what documents you
7 reviewed?
8    A   As I said earlier, sir, no, typically not.
9 Sometimes there are some exceptions. I may write down
10 review of deposition, but I typically -- if I don't
11 start out billing a case like that, I don't continue
12 on. I don't change it in the middle of the game in
13 other words. I'll just put down reviewing of
14 documents, but as far as the time is concerned, you
15 know, if one were to look at the amount of time spent
16 on it, it typically works out about the same, you know,
17 as far as deposition. If it was a three-hour
18 deposition, it takes me about that long to review it,
19 but you'll notice also on my list of documents reviewed
20 at the bottom there's an asterisks, it says received,
21 not yet reviewed. If you look up at No. 12, 13 and 14
22 depositions of Taylor, Corbin and -- I'm going to take
23 a guess at that last name, Pillai, P-I-L-L-A-I, those
24 were not reviewed. They were received, but not
25 reviewed.

## Page 48

1    Q   I appreciate that. I did see that.
2 Mr. Turner, when you received materials from Mr. Hall's
3 office there would be a transmittal letter with the
4 receipt of those materials; would it not?
5    A   Yes, sir.
6    Q   And in that transmittal letter would
7 indicate what was being sent to you; would it not?
8    A   I would think so.
9    Q   Would you provide me along with your
10 billing records all transmittal letters that you
11 received from Mr. Hall?
12    A   I will.
13    Q   All right. How many times have you billed
14 Mr. Hall?
15    A   I don't know the answer to that question,
16 sir. We'll have to find out once I get the invoices to
17 you.
18    Q   Can you tell me after you received the
19 retainer the first time that you would have billed
20 Mr. Hall?
21    A   Typically, it's usually within a month or
22 when I get done reviewing the bulk of the documents.
23 There's no set time frame. We don't bill the end of
24 the month, beginning of the month or something to that
25 effect. It's more or less as to the amount of work

Page 49

1   that's been done to date. If it's extensive, then it
2   will be billed.
3       Q   Mr. Turner, do you have any certifications
4   or licenses outside of your driver's license?
5       A   I do.
6       Q   Tell me what those are.
7       A   It's on my CV here. There's one that's not
8   on here quite yet, but I can go through those. It's on
9   this CV. It's Institute of Police and Technology
10  Management, commercial motor vehicle crash
11  investigation. That's IPTM out of Jacksonville,
12  Florida. Considered to be probably the most -- the
13  foremost facility for training on truck crashes and
14  police investigations. New Jersey State Police,
15  commercial motor vehicle inspections level 1 through 5,
16  FMCSA.
17          New Jersey State Police, passenger vehicle
18  inspector, motor coach, FMCSA. New Jersey State Police
19  Hazardous Materials Inspections. That's roadside
20  inspections for trucks carrying hazardous materials,
21  PHMSA. New Jersey State Police, weights and measures,
22  commercial motor vehicle. That's weighing trucks
23  coming across scales. It's considered to be a -- I'm
24  trying to think of the term. It just slipped my mind.
25  It's a weigh master.

Page 50

1          New Jersey State Police, hazardous
2   materials emergency response technician. New Jersey
3   State Police, cargo tank truck specialist. University
4   of Findlay, advanced emergency response tank truck.
5   University of Medicine and Dentistry of New Jersey,
6   hazardous waste site inspection certification.
7   University of Medicine and Dentistry of New Jersey,
8   hazardous waste site investigation supervisor
9   certification.
10          Association of American Railroads, Bureau
11  of Explosives, rail tank car specialist. New Jersey
12  Police State, confined space operations trainer.
13  Rutgers University, traffic control coordinator
14  certified. Smith System, multi-company driver trainer
15  instructor certified. And I just concluded taking the
16  training for NATMI which is N-A-T-M-I, North American
17  Transportation Management Institute. It's the only
18  certification service out there for certifying
19  transportation directors, directors of transportation.
20  I just concluded taking that training course. It's not
21  on there yet. And there are others as well that I just
22  haven't listed on there that I really haven't seen a
23  whole lot of relevance to. My CV is built on relevance
24  of what I do as an expert.
25      MR. HALL: Mark, can we take a short

Page 51

1   restroom break?
2       MR. BARROW: Yeah. I'll tell you what.
3   Rick, let him answer this. It's a quick question and
4   let him answer this, and then let's take a break.
5       MR. HALL: Yeah. That would be great. I
6   need to get my cell phone charger too. My phone's
7   about dying.
8       MR. BARROW: Okay.
9       A   Can you repeat that, sir?
10      Q   (By Mr. Barrow) Sure. Do you know David
11  Dorrity?
12      A   I'm sorry. Who?
13      Q   David Dorrity, D-O-R-R-I-T-Y?
14      A   The name sounds familiar. I'm just not
15  placing it, though.
16      Q   Have you ever talked to him?
17      A   I don't believe so. I don't -- it doesn't
18  sound familiar. I'm not going to say that I haven't,
19  but in relation to this case here, I don't believe
20  (sic) speaking to a David Dorrity. I'm not familiar
21  with who he is.
22      Q   You don't know who he is?
23      A   I don't believe so.
24      Q   You don't know who he is?
25      A   I mean, I know a few fellows named Dorrity.

Page 52

1       Q   Okay.
2       A   I know a few Irish fellows named Dorrity,
3   but I don't know him I don't believe.
4       MR. BARROW: I see. Let's take a quick
5   break.
6          (Thereupon, a brief recess was had.)
7       Q   (By Mr. Barrow) Mr. Turner, we were just
8   going through your certifications and your training as
9   itemized on your CV. In a couple of places you
10  indicate that your certifications and/or training
11  involve hazardous waste site investigation; correct?
12      A   Yes, sir.
13      Q   How do you define hazardous waste in those
14  circumstances?
15      A   It's no longer a sellable commodity or
16  product and it's going to ultimately be disposed of.
17      Q   And do you define the product that was
18  involved in this accident as hazardous waste.
19      A   No, but there is some relevant issues as
20  far as my experience is concerned that we would help me
21  get a better understanding of -- that there is some
22  training in there that would help me to understand a
23  little bit more clearly as to what the hazards
24  associated are with the chemicals and so forth.
25      Q   All right. Tell me what training would be

## Page 53

1    associated.
2    **A    Well, site assessment, risk assessment.**
3    **And a good example would be in this particular case**
4    **here if I recall seeing a deposition that stated that**
5    **there were dead kittens or something to that effect or**
6    **dead birds that were in the area of where these storage**
7    **facilities, storage tanks, this makeshift storage**
8    **facility was would tell me that there's some degree of**
9    **toxicity in the air that's likely killing these animals**
10   **off. So that goes into site investigation.**
11   Q    All right. Well, does the fact that you
12   say there were some dead animals in the vicinity
13   indicate to you that Totalox killed those animals?
14   **A    No, sir, but it's an indicator to me as I**
15   **just stated is that if there are dead animals in the**
16   **area other than what you would see out in the natural**
17   **environment, you could walk all day in the woods and**
18   **likely not find a dead animal, but if you walk into an**
19   **area and there are chemicals in that area, there is a**
20   **likelihood -- and I'm not saying specifically as a**
21   **result of Totalox, but it's an indicator to me based on**
22   **my training as hazardous waste site investigation doing**
23   **risk assessment I would look at that and say that there**
24   **is something in that environment that's off-gassing and**
25   **causing these animals to die and it's not me that said**

## Page 54

1    **that. It was testimony that's stated that.**
2    Q    Right. But you're not opining that the
3    Totalox caused that?
4    **A    Something did. I can't say what it was.**
5    Q    Sure.
6    **A    It's some type of chemical.**
7    Q    You know it was some type of chemical that
8    caused the death of whatever was noted in the area?
9    **A    Well, there's no autopsy done, but based on**
10   **my experience, based on my experience, if you have an**
11   **unusual kill of animals, for example, if you've got --**
12   **if you've got seals washing up on shores or fish**
13   **washing up on shore, there's something hazardous that**
14   **was dropped into that water. If you've got something**
15   **that's causing small kittens, an untold number of small**
16   **kittens or cats dying in that area, squirrels, birds,**
17   **what have you, that's an indicator to me that there's**
18   **something hazardous in that environment that's causing**
19   **that. Specifically as to what it is, I couldn't tell**
20   **you unless there was some type of autopsy that opined**
21   **on that. I just could not tell you.**
22   Q    Now, under your professional experience you
23   indicate that you've looked in excess of 1,000 tractor
24   trailer wrecks; correct?
25   **A    Yes, sir. Well in excess of a thousand**

## Page 55

1    **truck crashes.**
2    Q    And 200 tanker wrecks; correct?
3    **A    Yes, sir. In excess of 200 tanker crashes**
4    **and/or investigations, yes, sir.**
5    Q    And numerous rail tank car and trail --
6    excuse me, train derailments; is that right?
7    **A    Yes, sir.**
8    Q    And you specifically delineate there that
9    would be car and train accidents; correct?
10   **A    Rail car, rail car that is not specifically**
11   **personally owned type vehicles. Rail cars, tank cars.**
12   Q    And your professional experience -- and by
13   "professional experience," does that mean you have
14   expertise in these areas?
15   **A    Yes, sir.**
16   Q    Is that correct?
17   **A    Yes, sir.**
18   Q    Highway construction zones?
19   **A    Yes, sir.**
20   Q    Right?
21   **A    Yes, sir.**
22   Q    Airline diasters; right?
23   **A    Yes, sir.**
24   Q    What do you do, Mr. Turner, at an airline
25   disaster? When they call you out what are you asked to

## Page 56

1    do?
2    **A    It all depends on a particular airline. I**
3    **was directly responsible, my company, HMHTTC was**
4    **directly responsible whereas we responded to the --**
5    **right after 9/11, the jet that crashed in Queens, New**
6    **York, we went in and recovered that, the hazardous**
7    **material from the wings and also body parts. I did the**
8    **FedEx -- well, when I say "I," meaning my company, my**
9    **then company, I did the FedEx, 1997 FedEx jet crash at**
10   **Newark Airport, the MD-11 flipped upside down, had haz**
11   **mats on board. I did the FedEx crash that happened**
12   **with the DC-10 up in Newburgh, New York Airport. We**
13   **did the recovery on the jet, Captain Sullenburger's jet**
14   **that crashed in the Hudson River and where no fatals**
15   **(sic) were, occurred. We did the fuel recovery from**
16   **the wings on that particular jet and recovered the jet**
17   **itself.**
18   Q    What is bio-incident response?
19   **A    By the way, sir, there are other aircraft**
20   **diasters that I've responded to, but those are probably**
21   **the foremost highlight of all. I've done a lot of**
22   **personal smaller aircrafts as well as G4 crash into a**
23   **building at a place called Strawberry's in Teterboro,**
24   **New Jersey, and a number of others, but, anyway, go**
25   **ahead.**

## Page 57

1    Q    What is bio-incident response?
2    A    Bio-incidence response would be something
3    like a weapon of mass destruction. It's a live
4    organism that can injure an individual.
5    Q    And what experience do you have in
6    bio-incidence responses?
7    A    My company responded to the Anthrax
8    release. We were the first company in U.S. history, a
9    private sector company that responded to a
10   bio-terrorism incident and it was the Anthrax release
11   that occurred back in 2001 in the Hart Senate Building.
12   In addition to postal -- we did postal facilities as
13   well and I oversaw all those operations.
14   Q    Mr. Turner, that company, you closed that
15   company down in 2009?
16   A    Roughly. I don't remember if it was '09 or
17   '10. Specifically, I don't remember.
18   Q    I'll just say that your CV indicates 2009.
19   A    Right.
20   Q    And so my question to you is why did you
21   close the company down?
22   A    For several reasons. The economy. As I
23   stated earlier, hazardous materials are by and largely
24   leaving the United States and are being shipped out
25   overseas into China and India and Indonesia and so

## Page 58

1    forth, so a lot of haz mats have left the country
2    because they follow the manufacturing base. So it's
3    really putting a -- it was putting a serious crimp in
4    our revenues. So at a certain point I decided that I
5    had to get out before I was forced out and decided to
6    chop up and sell the company off before it was worth
7    nothing some day. Kind of looking down the road in the
8    future at hazardous materials in the United States,
9    so -- and I was really -- quite frankly, I was tired.
10   I mean, I started out in 1993 with $500 and built the
11   company up to billing $15 million a year by the year
12   2000, multiple offices around the country and I just
13   got tired and I just wanted to get out and do what I do
14   now and just have a little more secluded life as far as
15   that's concerned.
16   Q    Your professional experience indicates that
17   you've been involved in NIMBY haz mat litigation.
18   Could you define that for me?
19   A    Yes. NIMBY is not in my backyard. Folks
20   don't want to have hazardous materials in their
21   backyard, so they bring up a lawsuit against the
22   company that's proposing to construct a facility and
23   that may be in their neighborhood. A good example is
24   Parents For Safety. I've worked -- I was retained by
25   them as an expert to go try to stop a truck stop that

## Page 59

1    was -- had a lot of haz mats coming through it and was
2    very close to a school district in addition to
3    residential areas and they were trying to put a stop to
4    that. That would be one example.
5    Q    Contamination migration issues. What is
6    that?
7    A    Tank truck crashes. You've got MC-306 or
8    DOT-406, for example. Cargo tank truck crashes with
9    9,000 gallons of gasoline in it, diesel fuel or any
10   other kind of petroleum product. The material gets
11   into the ground. It gets into the ground water and
12   migrates sub-surface, so essentially trying to cut it
13   off knowing the migration pattern of the sub-surface
14   and cut the contamination off and begin a recovery
15   operation.
16   Q    And what do you mean by hazard risk
17   assessment studies? Give me some idea of what you're
18   talking about.
19   A    Sure. Going into a facility to try to make
20   a determination -- going back again to that truck stop
21   matter that I was talking about with Parents for
22   Safety. Going in and taking a look at a facility or a
23   proposed facility or a proposed operation and try to
24   make a determination as to what the risk v. benefit.
25   If there's a risk v. benefit in the economic circles

## Page 60

1    without barring the -- with serious consideration to
2    one's perspective of profit over safety mindset. So
3    taking a serious look at a proposed operation or an
4    operation that is just being retained to come in and
5    take a look at and make a determination if this is a
6    safe operation. Should we continue working in this
7    manner of operation.
8    Q    And then finally cleanup and remediation
9    cost studies and audits. I take it that's just the
10   added piece to your to haz mat, hazardous waste site
11   investigations, et cetera?
12   A    Well, yes, it is. It's being able to take
13   a look at remediation costs as far as -- let's say, for
14   example -- and I've had attorneys call me up and ask me
15   to take a look at an invoice of an environmental
16   contractor, a response contractor or a state agency
17   that responded to an incident and try to make a
18   determination as to what is fair and reasonable. A
19   good example would be a wrecker operation.
20   I had one at one point in time where I took
21   a look at and it was a pro bono for an insurance
22   company. They asked me to take a look at. It was for
23   Chubb. They had a wrecker service that came in and
24   charged $35,000 to recover a truck. Well, I was able
25   to look at photographs and so forth of seeing these

| Page 61 |
|---|

1  guys sleeping under trees for hours on end waiting for
2  the haz mat situation to be taken under control.  So it
3  disallowed their charges for that essentially is what
4  that is.
5      Q    All right, sir.  Mr. Turner, do you have a
6  copy of your deposition subpoena and notice of
7  deposition?
8      A    You know, it's in here, yes.  If you bear
9  with me one second, but I don't --
10     Q    Sure.
11     A    I kind of -- in my haste of leaving to get
12  down here, unfortunately, I forgot to bring quite a few
13  different things, but they were provided earlier on,
14  so --
15         (Thereupon, an off-the-record discussion
16  was had.)
17     Q    (By Mr. Barrow) All right.  Do you have the
18  subpoena duces tecum in front of you, Mr. Turner?
19     A    Yes, sir, I do.
20     Q    You had an opportunity to review that
21  subpoena and the requested materials that you bring
22  with you prior to your depo today; is that right?
23     A    Yes, sir.
24     Q    And I take it in response to that subpoena
25  you brought all of the documents and the things

| Page 62 |
|---|

1  required pursuant to that subpoena with you; is that
2  correct?
3      A    Everything was sent, was actually sent down
4  on a thumb drive to comply with the duces tecum.  As
5  far as -- go ahead.  I'm sorry.
6      Q    I'm sorry.  You said sent down on a thumb
7  drive?
8      A    It was sent down, yes, to Mr. Hall's law
9  firm on a thumb drive.
10     Q    When?
11     A    I would have to -- it would have been -- it
12  would have been several months ago, a couple of months
13  ago.  Let me put it this way.  The duces tecum was
14  September 12th, so it would have been after
15  September 12th.  Within two weeks of September 12.
16     Q    Within two weeks.  So everything you have
17  in response to these subpoena duces tecum was provided
18  to Mr. Hall within two weeks after September 12th; is
19  that accurate?
20     A    Approximately.
21     Q    Yes, sir.  Well, looking at this, for
22  example, I see in one of the categories bills for
23  services rendered.  Did you send those to Mr. Hall?
24     A    Initially, if it's not here -- now, if it's
25  in Mr. Hall's files, unfortunately, as I said in

| Page 63 |
|---|

1  getting prepared to come down here for some reason,
2  which I've never done before, I completely forgot the
3  whole entire file.  So Mr. Hall fortunately had the
4  file here and so whatever's here is what was produced.
5  I would think that there were invoices produced, but
6  that's typically the -- I don't do it myself.  Somebody
7  in my office takes care of it, but I would think that
8  it was sent down, but I guess it -- I don't see it
9  here.  It is on its way to you, though.
10     Q    As you're sitting there today, Mr. Turner,
11  you can't tell me with any assurance that you have
12  complied with the subpoena duces tecum?
13     A    I can't, exactly.  I cannot tell you with
14  100 percent certainty that it's been completely
15  complied with.  Anything that is short of this duces
16  tecum, though, would certainly be provided upon your
17  request.
18     Q    Sure.  We'll leave the deposition open
19  until we're able to determine whether you complied with
20  the subpoena duces tecum and, if not, whether we need
21  to continue the depo, but we'll have to make that
22  determination at a later date.
23         All right.  Mr. Turner, let's take a look
24  at your report which is dated July the 29th.  Do you
25  have that in front of you?

| Page 64 |
|---|

1      A    Yes, sir, I do.
2      Q    Very well.  Under No. 1.0, persons and
3  organizations, you have a number of facts and/or
4  allegations.  I want to find out more about that
5  listed.  What do you call this?  Under persons and
6  organizations, what is the list of these items under
7  that designation?  How do you define those?
8      A    Persons and organizations involved in the
9  event.
10     Q    And where did you get the information to
11  compile this list?
12     A    It would have been -- it would have been
13  documents that I reviewed and persons that I felt may
14  have been relevant to the situation or to the incident.
15     Q    Right.  I take it a lot of this information
16  could have come from, for example, Mr. Hall's first and
17  second amended complaints; correct?
18     A    It could have.  Any documents that were
19  provided to me, depositions, complaints, et cetera,
20  police reports and, you know, not in this particular
21  case, but any documents that I review, persons or
22  organizations that I feel may be relevant to the case
23  at hand will be listed on here.
24     Q    Mr. Turner, when you were operating tractor
25  trailers in that three-year period of your career

Page 65

1  itemized on your CV, did you ever have the opportunity
2  to offload chemicals such as Totalox as was performed
3  in this case?
4      A    Specifically to sodium permanganate, I
5  would say no, sir, but there are other chemicals in my
6  truck driving --
7      Q    Did you have the opportunity -- I'm sorry.
8      A    No.  That's all right.  In my trucking
9  history I have had opportunity to both load and offload
10  chemicals into and off of cargo tank trucks.
11     Q    And how would you typically offload those
12  chemicals?
13     A    Well, it depends on the type of system.
14  Well, not usually, but always my experience has been
15  that we would offload into steel piping that would go
16  into a bulk facility and that steel piping, the unions
17  are connected by a bolt-on flange is what we called
18  with gaskets in them.
19     Q    And how many times did you have the
20  opportunity to do that as a truck driver?
21     A    As a truck driver I would say maybe a dozen
22  times, but there's -- but in my management over the
23  years owning so many tank trucks that we did, I had
24  been present and assisted, not necessarily being the
25  truck driver, but when I was president and CEO and sole

Page 66

1  stockholder of HMHTTC response, I assisted with the
2  truck drivers which would operate our cargo tank
3  trucks.  I would assist in the loading and offloading
4  frequently.  Hundreds of times.
5      Q    Now, did you ever have any similar
6  incidence as occurred in this case?
7      A    No, sir, because we never would offload
8  into -- we would never pressurize a PVC line.  We would
9  not offload into a PVC line.
10     Q    Why not?
11     A    Unless somebody can prove to me that it had
12  a maximum -- a certified maximum -- certified by an
13  engineer a maximum allowable working pressure I just
14  would not put that system under any type of pressure.
15     Q    Why not?
16     A    You could blow it up.  Blow it up.  Well,
17  the better term would be to rupture it.  You could
18  rupture the system.
19     Q    How do you know that?  If you never had it
20  occur, how do you know that?
21     A    Logic.  Logic in 20 -- 20-some-odd years of
22  applying that logic to the real world.  In addition --
23     Q    Thank you very much.
24     A    -- I know it by the fact, the mere fact of
25  what happened here proved to me why I wouldn't do it in

Page 67

1  the past.
2      Q    Right.  You never had it happen previously;
3  right?
4      A    No, sir, because I've always operated in a
5  very safe environment.  I'm somebody that's stood up
6  before groups of folks such as New York City fire and
7  haz mat, New York City ESU, every haz mat team in the
8  state of New Jersey, many in New York, many in
9  Pennsylvania, as a matter of fact, I've spoken many
10  times in the state of California for CRHMO, something
11  like that, for their regional hazardous materials
12  organization.  The city of Chicago I've spoken as a
13  guest speaker on haz mat related responses, and often
14  you would get into loading and offloading of tank
15  trucks.  And it just to me based on that, I have been a
16  person that has been not only a safe operator and able
17  to talk about it, but thousands of incidence later
18  without being injured or getting anybody injured is
19  testimony to my safe operations on how I did things.
20  So that there in and of itself I think should allow me
21  to be able to testify on this being an unsafe type
22  system.  Makeshift, if you will.
23     Q    All right.  Thank you.  Thank you.  Are you
24  familiar with the Totalox?
25     A    No, but I am familiar with sodium

Page 68

1  permanganate, potassium permanganate and I've responded
2  to them in emergency response incidence in the past.
3      Q    You've never dealt with or handled Totalox
4  in your experience; is that correct?
5      A    Not Totalox specifically as an individual
6  chemical, but the components, the components that go
7  in -- or I should say the chemicals that make up
8  Totalox on an independent basis, I've responded to
9  them, yes, sir.
10     Q    Have you ever handled transportation of
11  deodorizers?
12     A    You know, specifically I cannot sit here
13  and tell you when exactly, but I know that I have.
14     Q    All right.  So how are they stored in
15  transit?
16     A    In transit they're going to be transported
17  in either an MC-306, DOT-406, an MC-307 or DOT --
18  excuse me.  Wait.  Hold on a second.  It probably would
19  not be in an MC-306 or DOT-406.  It would likely be in
20  an MC-307 or DOT-407, MC-312, DOT-412 would be
21  acceptable or non-spec type cargo tanks that actually
22  can handle that type product.
23     Q    And why is that?
24     A    Can you clarify that, please?
25     Q    Sure.  You mentioned a couple that you said

## Page 69

1     at first would likely.  Then you came back and said not
2     likely.
3         A    Because I had to think about it for one
4     second as to the application.  It's a lightly corrosive
5     material to the best of my recollection and it would
6     have to be transported in tank trucks that would be
7     designed to be able to transport that type material.
8     You don't want to take something like that -- you don't
9     want to take something like that and transport it in a
10    cargo tank truck that would not be able to accept that
11    type product because you could literally damage the
12    tank truck and potentially cause a release.
13        Q    And was the Fetter truck that transported
14    this material the correct type of truck to transport
15    this material?
16        A    I didn't inspect it, but it seems to be
17    that it would have been the correct type tank truck,
18    actually referred to cargo tanks, but it appears it
19    would have been the correct type cargo tank by design.
20        Q    Right.  And how are the deodorizers stored
21    at final site based on your experience?
22        A    Bulk storage facilities.
23        Q    And what would that look like?
24        A    A bulk storage facility would be a steel
25    above-ground storage tank typically speaking.  Could it

## Page 70

1     be stored underground?  Sure, but unlikely.  Typically
2     it's going to be a bulk storage facility which is going
3     to be a steel construction, possibly with a liner type
4     system in it and it would have -- as far as discharge
5     of the product, it would have a steel, could be
6     2-inch -- depending upon the use it could be a 2-inch
7     type valve.  You could also have poly type storage
8     tanks which would be a permanent type storage tank
9     above ground and that's very typical.  Like I said,
10    it's a poly storage tank that's intended for that type
11    of storage system.
12        Q    Now, the basis of your opinion as to how it
13    is stored at the final site, is that just based upon
14    your experience?
15        A    Yes, sir.
16        Q    You indicated that maybe a dozen times as a
17    tractor trailer operator you would have off loaded
18    chemicals; correct?
19        A    Operating cargo tank trucks I would say
20    roughly a dozen.  Personally myself where I was the
21    driver where I transported that load, I would agree
22    with that.  Again, it's been hundreds of times that
23    I've actually offloaded and onloaded working right
24    along doing the connection to the valves and walking
25    the lines and so forth.

## Page 71

1     Q    Sure.  Right now I'm focused upon your
2     experience as an owner/operator where you've offloaded
3     chemicals which I think you told me was a dozen times;
4     correct?
5         A    Well, no.  Again, as an owner/operator
6     you've got to break that down because I was also
7     technically an owner/operator of that company HMHTTC in
8     addition to the trucking company.  So if you want to
9     look at it in totality, it's been hundreds of times.
10    If you want to look at in specificity as to when I
11    was a driver, that would break down to maybe a dozen or
12    so times.
13        Q    All right.  Those time that you were a
14    driver, that would have occurred between was it
15    '85 and '88?
16        A    Roughly, yes, sir.
17        Q    Now, in those 12 instances when you would
18    have offloaded chemicals, were you the owner/operator
19    at those times or were you employed by someone else?
20        A    No, sir.  I was an owner/operator.
21    Whenever -- I've pretty much been my own boss for the
22    large majority of my life.
23        Q    All right.  In those 12 times did you
24    conduct an advance visit of the site you were going to
25    offload to between '85 and '88?

## Page 72

1     A    I was a lot more naive back then, so I
2     would say that I would not have been as cognizant as I
3     am with my experiences today.
4         Q    So is the answer "no"?
5         A    Sir, it's not a yes-or-no answer.  You have
6     to allow me to answer, please.
7         Q    Well, I think it is.
8         A    Well, sir-
9         Q    If you conducted the site visit -- let me
10    finish.  You either conducted the advance site visit or
11    you didn't.
12        A    Sir, it's not --
13        Q    That is a yes or no.
14        A    Sir, I'm not going to give you a yes-or-no
15    answer.  I have a right to elaborate on my answer, if
16    you will.  Agreed?
17        Q    Yeah.  And I don't mind that.  If you would
18    answer the question, then you can elaborate.
19        A    I will answer it in the same paragraph.
20    The answer is sometimes.  All right.  Back then I was
21    not as cognizant as I am today as being a guy involved
22    for many years of safety.  When I was a younger fellow
23    I didn't have as much awareness of safety, so I
24    didn't -- I may not -- I may have overlooked some
25    things, but looking at something that may have been a

## Page 73

1  facility that was not -- was not acceptable in my mind
2  I would not offload into it. And I say may not back
3  then. Now, I say to you absolutely not.
4      Q   All right. So you did not perform advance
5  visits to the sites you were going to offload to when
6  you were a truck driver between '85 and '88; am I
7  correct?
8      A   Well, there would really be no reason for
9  me to advance -- do a risk assessment because I'm the
10  individual that's pulling a load to that location. If
11  I were working for somebody else, I would think that
12  they would probably have that in place for it, a system
13  in place for that.
14      Q   All right. What's the basis for your
15  opinion that someone would have in place a system to do
16  that?
17      A   The terminology risk assessment comes just
18  from that. The very terminology risk assessment tells
19  me that. The terminology is not made up for purposes
20  of just vibrato. It's made up for a specific reason to
21  assess risk of what you're able to engage yourself
22  into.
23      Q   And I appreciate that, Mr. Turner, but
24  you've rendered an opinion in this case that both Carus
25  and the Andersons should have conducted an advanced

## Page 74

1  team visit to where the chemical was going to be
2  offloaded; correct?
3      A   I believe that they should have, yes, sir.
4      Q   All right. And you've just told me that
5  when you were the owner/operator of a truck
6  between '85 and '88 and you offloaded chemicals at
7  least a dozen times as the owner/operator of that
8  business offloading that chemical you did not perform
9  an advance visit to the offloading site?
10      A   All right. Let's --
11      Q   Correct?
12      A   Sir, again, not a yes-or-no answer, so
13  let's look at it this way and I'll answer it this way.
14  Does it make sense for me being an independent truck
15  driver if I am delivering a chemical from, say,
16  Knoxville, Tennessee, and I'm taking it out to Broken
17  Bow, Nebraska, does it make sense for me to fly out
18  there being the owner/operator of the truck -- and this
19  is a question that I'll answer --
20      Q   Sure.
21      A   All right. Obviously, I'm not asking you a
22  question. Would it make sense for me to fly from
23  Knoxville out to Broken Bow, Nebraska, to go and
24  inspect this site and then fly back, get in my truck,
25  drive out to Broken Bow, Nebraska, and drop that load?

## Page 75

1  And my answer to that is no, it doesn't because I'm the
2  driver that's driving out there. Now, had I arrived in
3  Broken Bow, Nebraska, and I saw that site was
4  insufficient and it was a safety hazard, you bet you
5  that I would not offload into it.
6      Q   Is the answer to my question -- because I'm
7  still waiting for the answer, Mr. Turner. The answer
8  to my question is between '85 and '88 you never
9  performed an advance visit of any site that you were
10  going to offload chemicals to; correct?
11      MR. HALL: Answer it to the best of your
12  ability.
13      A   I'm answering this to the best of my
14  ability is that you want to call advance being five
15  minutes by the time I get there, then we can call that
16  advance, but I would not offload into what I perceived
17  as an unsafe facility.
18      Q   Well, no. I want to define advance the way
19  you define it in your opinions. I want to be
20  consistent with how you define advance. So in your
21  opinions when you say that Carus or the Andersons
22  should have performed an advance team visit to inspect
23  the facility that the chemical was going to be
24  offloaded into, how do you define "advance"?
25      A   Okay. I'll define it this way by telling

## Page 76

1  you as the CEO of a corporation that delivered plenty
2  of loads of hazardous waste in cargo tank trucks, we
3  would never deliver to a facility in the past unless I
4  had one of my folks, one of my safety folks go to that
5  facility and inspect that facility. In addition, we
6  not only did it one time, we also pulled the records on
7  that facility from a safety standpoint if we're going
8  to be disposing of hazardous waste at that facility. I
9  want to know what are we pumping our product into
10  because I'm not going to get caught up into an injury
11  of one of my folks because they have an insufficient
12  facility. That would be the answer. That's the only
13  way I can answer that.
14      Q   All right. So your answer then is advance
15  means more than five minutes before you offload?
16      A   If you see reasonable expectation as to me
17  flying out from Broken Bow, Nebraska, to go and inspect
18  something if I'm going to be the driver -- it's an
19  illogical question.
20      Q   Mr. Turner, I'm trying not to confuse you
21  or confound you. It's a simple question. Advance --
22  do you define an advance visit as meaning five minutes
23  before the offload, a day before the offload, a week
24  before the offload? Tell me so I'll understand your
25  opinion of what you mean by advance. That's what I'm

Page 77

1  asking.
2      A    By a qualified person an advance
3  inspection -- at that point in time back in '85 I
4  thought I was a qualified individual.  So a qualified
5  individual that can come up here and inspect a
6  pipeline.  That would be my answer.  A qualified
7  individual.  Is a truck driver necessarily a qualified
8  individual?  Not in all cases.  Sometimes they may very
9  well be.  It's really going to depend on a case-by-case
10 basis.
11     Q    And I appreciate that, but you still
12 haven't defined advance for me.  Does that mean five
13 minutes before the offload, a day, a week, a month?
14 Define --
15     A    Well, I can --
16     Q    You've defined it -- wait a minute.  Let me
17 finish.
18     A    Go ahead.
19     Q    You've defined it as a qualified
20 individual, but you've not told me the time frame which
21 that visit is to take place before the offload.
22     A    Okay.  I will define it this way for you.
23 We have had -- as former CEO of my former company we
24 have had situations where we have had tank truck loads
25 of waste that we have done emergencies on in, say,

Page 78

1  hypothetically the state of Kentucky.  Now, of course,
2  I'm not going to take that waste and run it all the way
3  back to the east coast.  We're going to go to a
4  facility in Kentucky that we have never been to before,
5  so the manager who would be a qualified individual
6  would go either with the truck driver to the first load
7  or he would go there the day before or whatever the
8  case may be and inspect that facility to make sure that
9  it's acceptable to be able to offload into.  If we had
10 a long-standing relationship with a facility that's
11 local to one of our offices we would inspect that
12 facility prior to offloading.  So in answer to your
13 question, it could be five minutes by a qualified
14 individual.  To further answer your question, it could
15 be 30 days based on the relationship with that company
16 if it's a long-standing contract.
17     Q    What industry standard can you cite me to
18 that requires a shipper to send an advance team or a
19 qualified individual to inspect a container to which
20 the chemical's going to be offloaded into?
21     A    Offhand I cannot -- I cannot come up with
22 any -- API, I'm sure they would have something like
23 that, but I can't specifically identify anything.
24 Although my experience of 20 plus years, almost 25
25 years in dealing with haz mat specifically, that's

Page 79

1  my -- it's my opinion.  It's based on my opinion and
2  expertise.
3      Q    All right.  I appreciate that.  Can you
4  tell me any recognized treatise that would indicate
5  that a shipper has to send an advance team or qualified
6  individual to inspect a container to which the chemical
7  is going to be offloaded into prior to the offloading?
8      A    Once again, I would say to you that -- do
9  me a favor?  Repeat that question.
10         MR. BARROW:  Madame Court Reporter, could
11 you repeat it?
12         COURT REPORTER:  "Can you tell me any
13 recognized treatise that would indicate that a shipper
14 has to send an advance team or qualified individual to
15 inspect a container to which the chemical is going to
16 be offloaded into prior to the offloading?"
17     A    None that I could put my hand on right now,
18 but, again, if there comes an opportunity to amend my
19 report, I'm sure that there's something out there from
20 API, American Petroleum Institute, that if it does
21 exist it will be in there.
22     Q    Likewise, I take it your answer would be
23 the same if the question was about a chemical
24 manufacturer or mixer in addition to the shipper;
25 correct?

Page 80

1      A    Well, I know that there are chemical
2  companies out there.  There are chemical companies out
3  there that will go out in advance and take a look at a
4  facility before they -- for example, a perfect example,
5  GATX.  GATX is in the tank business.  They rent tank
6  space and I know for a fact that BASF, they'll go out
7  and they will inspect GATX facilities prior to
8  offloading into those tanks that are on site.  They
9  don't just sit there and start sending trucks in
10 without inspecting the site first.  Dow does that too.
11 As a matter of fact I know that Dow does it as well.
12 And I'm sure that all the major chemical carriers out
13 there, chemical manufacturers out there do the same
14 thing and I know it's based on experience.
15     Q    In terms of a published industry standard
16 or treatise you can't cite me to a published industry
17 standard or treatise that would require the chemical
18 manufacturer to go out there and inspect the container
19 proper to offloading?
20     A    Once again, I don't -- I cannot, but I will
21 be able to provide you with something at a later point
22 if I have to revise my report.  It's not just coming to
23 me right now, though.
24     Q    Now, you would agree with me that air
25 pressure line cleaning is common in the industry; is it

## Page 81

1    not?
2        A    If the receiving side is able to withstand
3    a maximum allowable working pressure. If it has an
4    established MAWP, then I would agree with that. If you
5    know that the system that you're what I'll call blowing
6    off into can handle that type of pressure, then
7    certainly it's a standard operating procedure.
8        Q    And what would the knowledge be of the
9    Fetter & Son driver at the time he cleaned his lines?
10       A    I'm not really aware of exactly what his
11   knowledge was. I know he had some degree of training,
12   but I don't know what the -- I don't know if he
13   actually had training other than having a standard
14   operating procedure that would -- it's standard
15   operating procedure. I would think that he was trained
16   on that. I believe, if I'm not mistaken, I believe he
17   was trained on that standard operating procedure --
18       Q    Okay.
19       A    -- of which he violated. I'm sorry?
20       Q    How do you define hazardous chemical?
21       A    Anything that's going to do harm to an
22   individual and/or property.
23       Q    And where will I find that definition
24   printed in any treatise or industry standard?
25       A    Well, there's definitions for hazardous

## Page 82

1    substance, hazardous materials. Specifically to
2    hazardous chemical, I believe that NIOSH uses hazardous
3    chemicals which is National Institute for Occupational
4    Safety and Health. And I believe that ACGIH which is
5    American College of Governmental Industrial Hygienists.
6    I believe they also use terminology of hazardous
7    chemical.
8        Q    How do they define the term?
9        A    I don't have that in front of me, but I
10   could tell you that the definition of hazardous
11   chemical is something to the effect that it is going
12   to -- hazardous being the operative word here is going
13   to cause hazard, excuse me, injury to an individual
14   and/or property.
15       Q    Any type of injury?
16       A    Well, a chemical injury is a chemical
17   injury whether it's respiratory, it's thermal, whatever
18   the case may be.
19       Q    Did you find any evidence that the town of
20   Lexington or the plaintiff communicated the PSI of the
21   tote system to Golden Eagle or Fetter & Son or the
22   driver?
23       A    No, but you would think that -- repeat that
24   question one more time, please.
25       Q    Sure. Do you find any evidence that the

## Page 83

1    town of Lexington or the plaintiff, Mr. Machin himself
2    communicated the PSI of the tote system to Golden
3    Eagle, Fetter & Son or its driver?
4        A    No, but I believe that Golden Eagle and/or
5    Carus should have come to the facility to inspect it to
6    see that it had some type of engineering certification
7    from a maximum allowable working pressure standpoint.
8    As far as Mr. Machin knowing what the pressure is, I
9    don't believe that he did and I don't believe that the
10   town did either.
11       Q    And your opinion that they should have
12   come, that's wrapped up in your opinion that they
13   should have done an advance visit --
14       A    I believe.
15       Q    -- prior to offloading the chemical?
16       A    I believe they should have, yes, it is my
17   opinion.
18       Q    Right. Right. All right. So the answer
19   to my question about you found no evidence that the
20   town or the plaintiff communicated the PSI of the tote
21   system to Golden Eagle, Fetter & Son or the driver;
22   would that be correct?
23       A    They came out there and they identified and
24   said that this systems looks to be -- I'll give you
25   Ellisor. Ms. Ellisor seems to be a profit over safety

## Page 84

1    mindset where she was interested in selling product, so
2    she came out and she essentially said, "Looks good to
3    me. Go ahead and fill it up." When she has the other
4    side of her -- excuse me, sir. Let me finish. You
5    have the other side of the equation which is the safety
6    individual from Carus saying that this system needs to
7    be replaced.
8        Q    Yeah. And I appreciate that. I know the
9    drum beat you want to make, Mr. Turner, but what I'm
10   going to ask you to do so that we're not here for
11   hours, which I don't mind. Mr. Hall is not going to
12   get back, but I'm going to ask you to first focus on
13   the question, answer the question, and then if you want
14   to explain it, by, you know, making statements like you
15   just made, please go ahead and do that.
16          My question is simply this. It's a simple
17   question. Any evidence that the town of Lexington or
18   the plaintiff communicated the PSI of the tote system
19   to Golden Eagle, Fetter & Son or their driver?
20          MR. HALL: Let me object to the form. Go
21   ahead.
22       A    Sir, it is not -- I am not going to sit
23   here and just give yes-or-no answers. All right. I
24   have to define your question. I've got to give you a
25   reasonable answer from my opinions and my opinion is

Page 85

1  just what I had got done saying to you a second ago is
2  that the town of Lexington, they didn't communicate
3  that, no. As far as Mr. Machin, he didn't communicate
4  that, no, but --
5      Q   Okay.
6      A   -- there is -- it's not okay at this point
7  yet because you have two individuals that come in and
8  say that -- this one says from Carus that this tank or
9  the system here, this makeshift system is acceptable
10  and you have somebody else that comes in and says it's
11  not acceptable.
12      Q   Who says it's not acceptable?
13      A   Mr. Myers, something to that effect. It
14  wasn't specifically that terminology, but Mr. Myers
15  said that the system needs to be upgraded.
16      Q   What type of pumps do trucks use for
17  offloading chemicals?
18      A   There's different types. Very few have
19  double diaphragms, but typically they're a Roper type,
20  what you call as a Roper type system.
21      Q   Have you ever heard of a pony pump?
22      A   Yes, sir. A pony pump is essentially
23  powered within itself and you'd pull on it. It's got a
24  little engine attached to it and this is what was used
25  here. It's essentially centrical.

Page 86

1      Q   And those are standards pumps that's used
2  in the trucking industry; are they not?
3      A   Not necessarily standard. There are
4  different types out there, but it is one of the types.
5      Q   One of the many that would be included in
6  the umbrella of standard pumps in the trucking
7  industry. Would you agree with that?
8      A   Oh, sure. I don't disagree with that at
9  all.
10      Q   Right. Now, do those pumps work at a
11  standard PSI?
12      A   It's going to depend on the individual
13  units. I did not inspect this unit, so I cannot sit
14  here and tell you that a pump works at 25 PSI or 15 or
15  30 PSI. It's going to depend on the specific type tank
16  truck, the specific type pump that you're using.
17      Q   Why must the truck's pump conform to the
18  pressurization of the tote system, if it should?
19      A   Because if you have -- hypothetically, if
20  you have a 15 PSI pump and you're pushing into a 5 PSI
21  system, that's not been rated for 5 PSI, but let's just
22  say hypothetically it is, you stand a very, very good
23  chance of once you reach that, go beyond that PSI of
24  rupturing the system. That's what you had here. I'm
25  not saying that it was 5 PSI, but just as an example.

Page 87

1      Q   Right. Well, shouldn't a tote system
2  conform to the pressurization levels of the truck?
3      A   Should not the tote system -- I think that
4  that's -- I think that that's up to the carrier to make
5  that determination.
6      Q   Well, wouldn't it have been more reasonable
7  for the town of Lexington to build a system to accept
8  pressure levels standard in the trucking company?
9          MR. HALL:   Object to the form.
10      Q   You can answer.
11      A   There's a lot of blame to go around here,
12  but, you know, as far as Lexington is concerned, they
13  were taking the word from Carus coming out there and
14  saying your system looks good. Let's go ahead and fill
15  it up. And that again to me is a profit over safety
16  mindset.
17      Q   So that the town of Lexington had no
18  responsibility in your opinion?
19      A   The town of Lexington took the word of the
20  chemical manufacturer that knows this chemical, looked
21  at the system and would presumably be aware of what a
22  bulk storage facility should look like, comes out and
23  says that this facility is acceptable, then --
24  Lexington is not in the chemical industry. It would
25  seem to me that they would take that opinion in high

Page 88

1  regard. Here's a company that manufactures this
2  chemical. Here's a company that delivers this chemical
3  through their carriers. So it would seem to me that a
4  company that or, excuse me, a town which is not
5  involved in the chemical industry would look at that
6  and take that opinion in high regard.
7      Q   Mr. Turner, your opinion in this regard is
8  that based on anything other than your experience?
9      A   No. It's based on my many years of
10  experience of dealing with literally thousands of
11  incidence.
12      Q   Let me ask you then, you would agree that a
13  gravity feed would not be practical here because this
14  is an above-ground facility; right?
15      A   I would agree with that.
16      Q   So the use of a pony pump was appropriate.
17  Would you agree with that?
18      A   No, it's not. No, it's not, sir.
19      Q   Why not?
20      A   Because it's going to pressurize a system
21  that should not be pressurized.
22      Q   All right. And tell me what treatise or
23  printed industry standards supports that opinion?
24          MR. HALL:   Object to the form.
25      Q   You can answer.

## Page 89

1    A    Repeat the question again, please.
2    Q    Tell me what printed, stated industry
3    standard that I can go look up or what treatise
4    supports your opinion that the pony pump was improper?
5        MR. HALL:  Object to the form.  You can
6    answer.
7    A    There is -- this is just a logical -- a
8    prudent man issue as far as I'm concerned.  Now, I can
9    assure you that there's something under API.  It's
10   going to be petroleum related, though, that's going to
11   tell you do not pump off into -- you can look that up.
12   I cannot cite you verse and chapter, but there's going
13   to be under API standards that's going to say do not
14   pump off into substandard systems.
15   Q    All right, sir.  In response to the subpoena
16   duces tecum that we sent you did you pull any of those
17   standards, print them out and provide us with those for
18   your deposition?
19   A    No, sir, because, again, they would be
20   related to petroleum.
21   Q    So when I specifically asked for any and
22   all books, chapter books, segment of books, magazine
23   articles, seminar materials, scholarly papers or other
24   written information which have either been published or
25   authored for publication by you and in support of your

## Page 90

1    opinions, you did not provide us with any; did you?
2    A    No, sir.  If you look back on my report it
3    says --
4    Q    Okay.
5    A    -- the references that are provided it says
6    Federal Motor Vehicle Safety Regulations and NATMI
7    which is Motor Fleet Safety Supervision Principles and
8    Practices.  If you look on my report that was the
9    extent of it.
10   Q    Mr. Turner, just generally now, is there
11   anything wrong with applying air with a CMV air system
12   to clear the line?
13   A    Is there anything wrong with applying air
14   to clear a line, a chemical line?
15   Q    With a CMV air system to clear the line.
16   A    I would say that in this particular case
17   here --
18   Q    In general.
19   A    In this particular case here --
20   Q    No, generally.  No, no, no.  Listen to my
21   question.  Generally.
22   A    Right.
23   Q    My question is generally is there anything
24   wrong with applying air with a CMV air system to clear
25   the line?

## Page 91

1    A    Absolutely not.
2    Q    And in this case your opinion is what?
3    A    My opinion is that pressurizing a makeshift
4    baffled system together that has no certification of
5    maximal allowable working pressure by an engineer
6    creates an extremely hazardous environment.  Therefore,
7    you should not use a pressurized system to clear the
8    lines.
9    Q    And, again, that is solely based on your
10   experience; correct?
11   A    Based on my experience of thousands of
12   incidence, yes, sir.
13   Q    All right, sir.  Now, assume for me that
14   this tote system had been properly pressurized.
15   Wouldn't it have been more likely that the chemical
16   would have spilled during a walk the line scenario --
17   A    No, sir.
18   Q    -- where you detach the line, where you
19   detach the line, position a bucket than if you use a
20   valve system as it was employed in this case?
21   A    No, sir.  If you had a trained driver on
22   how to walk the line, you would not have a spill.
23   Q    Why not?
24   A    Because it's a process.  It's a specific
25   process that I can't demonstrate for the benefit of the

## Page 92

1    court reporter, but essentially you disconnect the one
2    side.  Once you close your valves off, drain the
3    product and you walk the line in order to be able to
4    vacate the product from the line.
5    Q    And, again, that's solely based on your
6    experience; is it not?
7    A    It's pretty much industry standard.  I
8    mean, this is how -- every terminal -- every terminal
9    around the United States right now today will have
10   somebody walk the line.
11   Q    Tell me what document I can go to that
12   defines that industry standard so that I can review it
13   myself?
14       MR. HALL:  Object to the form of the
15   question.
16   A    Again, it's going to fall under --
17   Q    Let me finish.  Or is that simply your
18   opinion based on your experience?
19   A    Two-part answer.  API standards -- API
20   standards, but it is in relation to petroleum and I
21   didn't cite it in here because it is petroleum, No. 1.
22   Number 2 is that it is based on my opinion
23   predominantly because of the simple fact of my
24   experience.
25   Q    I appreciate that.  Now, can you point me

## Page 93

1  to any industry standard, published industry standard
2  that states that a truck driver can only fill into a
3  metallic line?
4      **A    No.  Certainly there's nothing out there**
5  **that says that, but there are industry standards again**
6  **in API that are going to talk to the issue of**
7  **pressurizing lines as you're offloading, but, again, it**
8  **is petroleum.  The American Petroleum Institute.**
9      Q    Right.  And that's why you didn't cite that
10  and that's why you didn't provide me with a copy of the
11  subpoena duces tecum; correct?  You've already stated
12  that, I believe?
13      **A    That's correct.**
14      Q    Am I correct?
15      **A    That's correct.**
16      Q    All right.  Now, Mr. Turner, you agree that
17  the town storage system was poorly constructed?
18      **A    I would agree with that, yes, sir.**
19      Q    All right.  And you have no evidence that
20  Golden Eagle played any role in the configuration or
21  construction of that system; correct?
22      **A    No, they didn't, but they had -- no, they**
23  **didn't, sir.**
24      Q    And it's your opinion that but for the weak
25  points in the tote system there would have been no

## Page 94

1  event in this case, no incident; is that right?
2      **A    But for the weak points in the system there**
3  **would not have been an incident?  I would agree with**
4  **that.  I would agree with that, yes, sir.**
5      Q    Right.  And you admit in your report that
6  the risk of a mist was greater because of the makeshift
7  PVC right?
8      **A    Yes, sir.**
9      Q    All right.  Now, what is maximum allowable
10  working pressure?
11      **A    Maximum allowable working pressure is a**
12  **designation for tank trucks and a designation for**
13  **pipeline facilities and tanks as far as how much**
14  **pressure you can exert onto that system and there's**
15  **allowances built in for that to prevent rupture.**
16      Q    And you'd agree that determining -- and
17  that's referred to MAWP; is it not?
18      **A    MAWP, yes, sir.**
19      Q    Maximum allowable working pressure?
20      **A    Yes, sir.**
21      Q    You would agree that determination of the
22  MAWP of a container depends on its design and
23  construction and the materials used; correct?
24      **A    That's correct.**
25      Q    All right.  Now, you would agree with me

## Page 95

1  that the designer or the manufacturer of a container
2  system is best positioned to determine its MAWP;
3  correct?
4      **A    Repeat that again, please.**
5      Q    Sure.  I mean, you'd agree that the
6  designer or the manufacturer of that container system
7  is the one who's in the best position in determining
8  its MAWP?
9      **A    It should be.**
10      Q    Right.  And you'd agree that determining
11  the MAWP of a container requires certain testing;
12  right?
13      **A    Yes, sir.**
14      Q    Right.  And the owner of the container is
15  best positioned to test it; correct?
16          MR. HALL:  Object to the form of the
17  question.
18      Q    You can answer it.
19      **A    The owner certainly should have had it**
20  **tested.  Likewise, the company that's going to be**
21  **offloading into there should have demanded a document**
22  **that demonstrates the MAWP.**
23      Q    Yeah.  And I appreciate that, but that's
24  just not an answer to my question, so I'm going to ask
25  you again to listen to my question and just try to

## Page 96

1  respond to that.  You can explain your answers, of
2  course.  Wouldn't you agree that the owner of the
3  container is best positioned to test it?
4          MR. HALL:  Objection to the form.
5      **A    Again, the owner is in the position to test**
6  **it and should have it tested.  However, going on to**
7  **explanation of my answer is that any companies that are**
8  **going to offload into that facility should inspect it**
9  **prior to allowing it to be loaded into and in this case**
10  **here Carus did that.  However, they gave a green flag**
11  **to a substandard system.**
12      Q    Is it your testimony then, Mr. Turner, that
13  the owner, the town of Lexington was not in the best
14  position to test their container to determine the MAWP,
15  the best position?
16      **A    Again, I believe that they should have**
17  **tested it, sure.**
18      Q    Do you believe that a carrier has a duty to
19  assign an MAWP?
20      **A    That a carrier has a duty to assign an**
21  **MAWP.  Can you rephrase that, please?**
22      Q    I don't know how to rephrase it.  You do
23  know what a MAWP is.  You know what a carrier is.  I'm
24  asking you do you believe that a carrier has a duty to
25  assign an MAWP?

## Page 97

1    A    The duty -- the carrier should have a duty
2  to come out on site and verify that the MAWP -- if
3  you're looking at a tank, you're going to be blowing
4  off into a tank to verify that that MAWP exists. In
5  this case here to the best of my knowledge no MAWP
6  existed.
7    Q    All right. Is it your belief then that
8  Fetter & Son had a duty to assign a MAWP or perform
9  testing?
10    A    I believe it would have been prudent.
11    Q    No, sir. That's not my question. Again,
12  please listen to my question. And I say that because
13  we continue to have the same problem and I want to be
14  respectful of your answers and your ability to answer,
15  but I also want you to be respectful to the question
16  I'm asking. Okay?
17    A    Yes, sir.
18    Q    Is it your opinion that Fetter & Son had a
19  duty to assign a MAWP and is it your opinion that they
20  had a duty to perform testing?
21        MR. HALL: Objection to the form. Go
22  ahead.
23    A    I believe -- I don't believe that they
24  should have to do testing. I believe that they should
25  have demanded or requested some form of documentation

## Page 98

1  that provides them with the knowledge of a MAWP.
2    Q    And where can I find that written down in
3  an industry standard or a learned treatise?
4        MR. HALL: Object to the form.
5    A    Again, as in all --
6    Q    Where can I go find that?
7    A    Again, as in all of the previous statements
8  as to API, I believe it existed in API, but it is in
9  relation to petroleum.
10    Q    Petroleum only; correct?
11    A    Yes, sir.
12    Q    API is related to petroleum only; correct?
13    A    I said yes, sir. And API stands for
14  American Petroleum Institute. That's why I didn't cite
15  it in my report.
16    Q    Right. I understand. We're not talking
17  about a petroleum product here; are we?
18    A    No, sir.
19    Q    Right. Is it your opinion -- go ahead.
20    A    But it would be relative in the sense -- it
21  would be relevant in the sense that it's a liquid phase
22  product.
23    Q    Is it your opinion that a carrier has a
24  duty to discover the MAWP?
25    A    That the carrier has a duty to discover the

## Page 99

1  MAWP. Yes, it is.
2    Q    And what's that based on?
3    A    Again, industry standard and knowledge of
4  many large chemical corporations that deliver products
5  other than specifically petroleum meaning your BA, Dows
6  and duPonts, et cetera. They require that information
7  before they just offload into a facility.
8    Q    Where would I find that printed industry
9  standard that itemizes that duty?
10        MR. HALL: Objection to the form. Go
11  ahead.
12    Q    You can answer.
13    A    Once again we can go back to API, but API
14  is petroleum, sir.
15    Q    All right. So other than API that you keep
16  telling me about that you admit is only related to
17  petroleum, there is no other printed industry standard;
18  is there?
19    A    To the best of my knowledge specific to
20  Totalox, no, sir.
21    Q    What standard requires a chemical
22  transporter, shipper or manufacturer to validate the
23  sufficiency of a receiving container?
24    A    There's going to -- again, you know, we're
25  going around and around on the same issue, but it's

## Page 100

1  going to fall in on API standards. Is there something
2  specific to Totalox? The answer would be no. Is there
3  something specific to petroleum products? Yes. Would
4  it create an environment of a prudent man type of
5  scenario? Sure, it would.
6        (Thereupon, an off-the-record discussion
7  was had.)
8        (Thereupon, the lunch recess was had.)
9    Q    (By Mr. Barrow) All right. Mr. Turner,
10  what does DPCC mean?
11    A    BTCC?
12    Q    DPCC.
13    A    Oh, discharge prevention. It's SPCC which
14  is spill prevention. It's discharge prevention cleanup
15  and countermeasures.
16    Q    Now, you'd agree with me that the
17  development of the DPCC and SPCC plans is the
18  responsibility of the container owner?
19    A    Yes, sir.
20    Q    And in this case that would be the town of
21  Lexington; correct?
22    A    Yes, sir.
23    Q    All right. And you'd agree with me that
24  the execution of the DPCC and the SPCC plans is the
25  responsibility of the container owner as well?

Page 101

1    A    Yes, sir.
2    Q    And there is no evidence that Golden Eagle
3  or Fetter were ever told anything about the MAWP, the
4  SPCC or the DPCC.  Would you agree with that?
5    A    I would agree because I don't think one
6  was -- I don't believe one was ever established.
7    Q    Now, is there any evidence in this case
8  that the driver for the Fetter & Son didn't have a
9  basic understanding of his function?
10    A    I'm sorry.  Repeat that again.
11    Q    Sure.  Is there any evidence that the
12  driver for Fetter & Son didn't have a basic
13  understanding of his function?
14    A    I believe he had a basic understanding of
15  it.
16    Q    All right.  Is there any evidence that his
17  employer failed to train him?
18    A    Not to the best of my knowledge.  I mean, I
19  haven't seen any documents that would say one way or
20  the other.
21    Q    Right.  Now, do you know if the driver
22  violated his company's policy?
23    A    He did.
24    Q    In what way?
25    A    Specifically, I can give you No. 26 I

Page 102

1  believe it was.  Number 26 on the policy.  If air is
2  present in your hose shut the customer's tank vessel
3  which appears to me that did not happen.
4    Q    All right.  So his own company's policy
5  said to do that and it's your opinion that he did not
6  do that; is that right?
7    A    It's my opinion that he did not.  Other
8  than that, you would not have had a rupture further
9  down the line.
10    Q    Do you have any evidence that Golden
11  Eagle's not vetting the tote system had anything to do
12  with a profit motive?
13    A    Do I believe that Eagle not --
14    Q    No, sir.  Do you have any evidence?  Do you
15  have any evidence?  Not belief.  Do you have any
16  evidence that Golden Eagle's not vetting the tote
17  system had anything to do with the profit motive?
18    A    I believe that based on -- based on
19  testimony that they acted in a profit over safety
20  manner.
21    Q    No, sir.  Listen to my question.  I'm
22  sorry.  I must have been confusing to you.  What
23  evidence do you have that Golden Eagle's as you say
24  failure to vet the tote system had anything to do with
25  a profit motive for Golden Eagle?

Page 103

1    A    A profit over safety motive you mean?
2    Q    Yes, sir.
3    A    All right.  It's just based strictly on
4  testimony, my opinion, my overall opinion.
5    Q    It's based on assumption; is it not?
6    A    Yes.  I'll define it.  It's based on the
7  fact that they did not, they did not take the advice of
8  Carus that this system by Mr. Myers at Carus stating
9  that the system was substandard, not exact language,
10  but something to that effect.  They should have reacted
11  on that.  They should have looked at the facility to
12  see if the facility was acceptable for this type of
13  pressurization and requested that -- at a bare minimum,
14  at a bare minimum they should have requested from the
15  receiving facility, Lexington in this case, they should
16  have requested a maximum allowable working pressure
17  type document certification.
18    Q    All right.  Now, as we've already discussed
19  you can't refer me to any printed industry standard or
20  learned treatise that puts that burden on Fetter & Son
21  or Golden Eagle, but in addition to that you're saying
22  that because they didn't request that information or do
23  that advance team visit that that was a profit motive?
24        MR. HALL:  Objection to the form.  Go
25  ahead.

Page 104

1    A    I believe --
2    Q    And that's what I want you to explain to
3  me.
4    A    As far as Carus is concerned?
5    Q    No, sir.  I'm talking about Golden Eagle.
6    A    All right.  As far as Golden Eagle is
7  concerned, I think that they should have -- again, I
8  mean, I may not be answering it the way you like me to,
9  but they should have inspected this facility and by not
10  inspecting the facility they opened themselves up to a
11  liability because they had no idea whether this system
12  could handle that type of pressure or not.
13    Q    Yeah, but where's the evidence that they
14  didn't do it because they thought they could make more
15  money or it was going to be an enhanced profit for
16  them?
17    A    Not necessarily enhanced --
18    Q    Where's the evidence for that?
19    A    There's not necessarily an enhanced profit.
20  I think that that terminology is incorrect.  I mean, it
21  almost sounds like --
22    Q    Okay.
23    A    I don't think that that's correct.  Just
24  profit in and of itself?  Well, if you don't have
25  wheels turning in the trucking business that means

| Page 105 |
|---|

1  you're not making money, so if you shut -- if you turn
2  this customer away and you start asking for certain
3  documents maybe a carrier turns around and says that
4  this may -- this may prevent us from getting additional
5  work from them, so let's just make sure that we keep on
6  hauling loads.
7      Q   You'd agree with me Golden Eagle didn't own
8  the delivery trucks.  Fetter & Son did; right?
9      A   Correct.
10     Q   You'd agree with me that they did employ
11 the driver.  Fetter & Son did; correct?
12     A   No, sir.  They were the broker.
13     Q   Is it your testimony that Golden Eagle
14 employed the driver?  Is that your testimony?
15         MR. HALL:  Objection to the form.
16     A   No, sir.  I just said that they were a
17 broker.
18     Q   All right.  I'm sorry.  I must have
19 misunderstood you.  All right.  So they didn't own the
20 truck and they didn't employ the driver; right?
21     A   Correct.
22     Q   All right.  They did not design the tote
23 system in Lexington's -- in the town of Lexington's
24 complex; correct?
25     A   That's correct.

| Page 106 |
|---|

1      Q   All right.  So I take it your position that
2  Golden Eagle bears some responsibility in this matter
3  is solely related to the failure to in advance of the
4  offloading inspect the tote system; am I right?
5      A   By a qualified individual, yes, sir.
6      Q   All right.  And we've talked about that;
7  have we not, Mr. Turner?
8      A   Yes, sir.
9      Q   The basis for that; correct?
10     A   Yes, sir.
11     Q   And that being your I've forgotten how many
12 years experience, but your number of years experience
13 in this area; correct?
14     A   That's correct.
15     Q   You'd agree with me that Golden Eagle
16 didn't have any relationship with the town of
17 Lexington; correct?
18     A   No.  They were dealing directly with --
19 Golden Eagle did from the standpoint of them being a
20 broker of the materials, so they are for all intents
21 and purposes a middleman.
22     Q   Did Golden Eagle ever have any
23 communication with the town of Lexington?
24     A   To the best of my knowledge, I don't know.
25     Q   Right.  And did they have a contract with

| Page 107 |
|---|

1  the town of Lexington?
2      A   No, sir, not that I'm aware of.  But maybe
3  verbal, but nothing in writing as far as I understand.
4      Q   Well, you haven't seen any verbal contract;
5  have you?  I mean, now you're starting to guess and I
6  want you to be real specific.  This is important.
7      A   I said possibly a verbal contract.  I said
8  nothing in writing.
9      Q   But tell me what verbal contract they had?
10     A   Did I say definitely?  No.  I said
11 possibly.
12     Q   Well, tell me why you say possibly?
13     A   I don't know if they've ever spoken or not.
14 I don't know for sure, so if they've never spoken they
15 would have never had a verbal contract.
16     Q   Right.  There was no client relationship
17 between the town of Lexington and Golden Eagle?
18     A   None that I'm aware of.
19     Q   Right.  So if they had no relationship with
20 the town, they had no contact with the town, they
21 weren't a client of the town, the town wasn't a client
22 of theirs, why is that Golden Eagle has a duty to
23 inspect the site?
24     A   Golden Eagle should have asked the question
25 of Carus, have you inspected this site?  And if Carus

| Page 108 |
|---|

1  said yes, we have.  It's acceptable to be able to ship
2  the loads there, then that would be one issue, but I
3  don't know if that conversation ever took place.
4  Golden Eagle has an obligation at least to check with
5  Carus and/or check with Fetter and find out if the
6  facility had ever been inspected or at a bare minimum
7  that there had been a document provided with the
8  maximum allowable working pressure for the system.
9  That never took place.
10     Q   All right.  Now, that duty that you just
11 defined is not written down in any industry standard I
12 can look at, not published in any learned treatise, but
13 the basis for that duty comes from your many years of
14 experience as we've discussed now quite a bit; isn't
15 that right?
16     A   Yes, sir.
17     Q   Now, are you familiar with the FOB
18 designation in shipping?
19     A   Yes.  I can't remember what FOB stands for,
20 but I am, yes, sir.
21     Q   All right.  Where was the FOB in this case?
22     A   It would have been Lexington.
23     Q   Lexington.  Would you agree that Golden
24 Eagle was free of risk and liability when the chemical
25 left its facility?

## Page 109

1      MR. HALL: Objection to the form of the
2   question.
3      Q   You can answer.
4      A   **Repeat that one more time, please.**
5      Q   Sure. You'd agree that Golden Eagle was
6   free of risk and liability when that chemical left its
7   facility.
8      MR. HALL: Same objection.
9      A   **Had they checked with Carus and Carus had**
10  **said that this was an acceptable facility, that the**
11  **MAWP is such, then I would agree with that.**
12     Q   So you don't agree with that?
13     A   **I don't based on my answer, correct.**
14     Q   Why not?
15     A   **I just defined that.**
16     Q   So what does FOB mean?
17     A   **I just also said a moment ago that I don't**
18  **recall exactly. It's freight something or other, but I**
19  **don't recall exactly what FOB stands for.**
20     Q   Well, you know what it means, though.
21     A   **I do.**
22     Q   Regardless of what the words stand for,
23  what does FOB mean in the shipping industry?
24     A   **It's the location that the product -- the**
25  **end product, where it winds up, at. Where the shipper**

## Page 110

1   **takes it to.**
2      Q   Mr. Turner, you're an expert in this field;
3   aren't you?
4      MR. HALL: Objection to the form.
5      A   **I never said that I'm an expert in**
6   **shipping, shipping and receiving.**
7      Q   Okay.
8      A   **All right. But I am an expert in dealing**
9   **with hazardous material leases and also**
10  **trucking-related issues.**
11     Q   Right. And you'd agree that Golden Eagle
12  is the shipper. Was Golden Eagle the shipper?
13     A   **Golden Eagle was the broker.**
14     Q   Broker. Who's the shipper?
15     A   **The shipper would have been the motor**
16  **carrier. In this case here was Fetter.**
17     Q   Fetter & Son.
18     A   **The shipper was Golden Eagle, and then**
19  **Carus is the manufacturer and they also under license,**
20  **under license either verbal or written or otherwise**
21  **they actually manufacture the product as well. Golden**
22  **Eagle did.**
23     Q   You'd agree with me that the town could
24  have facilitated the shipment if it wanted to; right?
25     MR. HALL: Objection to the form.

## Page 111

1      A   **The town could have facilitated the**
2   **shipment?**
3      Q   Sure.
4      A   **Yes, sir.**
5      Q   Okay.
6      A   **Not perform it themselves, but they could**
7   **have established the shipper relationship.**
8      Q   Okay. Bear with me. Now, in your report
9   on page 12 you list your opinions; correct?
10     A   **Yes, sir.**
11     Q   All right. Your opinion No. 1, I'm going
12  to walk through these fairly briefly with you.
13     A   **All right.**
14     Q   Terry Weiser, now, he was the driver at
15  Fetter & Son; right?
16     A   **Yes, sir.**
17     Q   And you say that had he been adequately
18  trained to identify the substandard receiving vessels
19  he would have not offloaded in the PVC baffled tote
20  storage system; right?
21     A   **Correct.**
22     Q   And, of course, you indicated earlier in
23  response to my question that Weiser's training would
24  have been conducted by his employer, Fetter & Son;
25  correct?

## Page 112

1      A   **That's correct.**
2      Q   All right. You go on to say in No. 2 that
3   the failure of Carus to effectively warn and/or train
4   the Lexington sewage personnel of the hazards
5   associated with Totalox created an environment for an
6   ability to make an informed decision on respiratory
7   protection; is that right?
8      A   **Yes, sir.**
9      Q   Explain to me again where I can find the
10  standard of care in a printed form or a learned
11  treatise that indicates that Carus had a duty to
12  effectively warn or train Lexington on the hazards
13  associated with Totalox.
14     A   **It's the shipper here. Excuse me, the**
15  **manufacturer of the product took it upon themselves to**
16  **train. Carus had already done some training for the**
17  **folks at Lexington. They never discussed the extreme**
18  **nature which is mentioned in the MSDS of the hazard**
19  **that they're dealing with from a respiratory standpoint**
20  **and so forth. So is there any -- is there any**
21  **documents out there as far as -- you know, standard of**
22  **care or something like that that says that they're**
23  **obligated to train? They took on that responsibility.**
24  **So if they took on that responsibility they have an**
25  **obligation to make sure they train correctly and fully.**

Page 113

1    Q    All right. But there's no documents that
2    detail the standard of care in that regard?
3        MR. HALL: Objection to the form.
4    A    The OSHA Act of 1970 requires -- says that
5    the employer shall provide a workplace free from
6    hazardous, et cetera. They transferred that over to
7    Carus by asking them to train their personnel on
8    product that they were selling to them, so based on
9    that in my mind, in my experience that they should have
10   had trained appropriately as to the hazards associated
11   with the chemicals they were dealing with.
12   Q    You also go on to opine that had proper
13   respiratory protection been afforded to Mr. Machin that
14   his injury would not have occurred; correct?
15   A    That's correct.
16   Q    And it was the town of Lexington that had
17   to provide him with that respiratory protection; isn't
18   it?
19   A    It would be their obligation to provide the
20   respiratory protection, but had the training been done
21   effective and efficiently in order to be able to convey
22   the absolute hazards of dealing with this material,
23   then at that point in time Lexington likely would have
24   had realized and said we need to buy some respiratory
25   protection or Carus in training would have said that

Page 114

1    dealing with a substandard system like this which they
2    shouldn't have been dealing with in the first place,
3    you need to have some respiratory protection in place.
4    Q    Right.
5    A    But by Carus looking at that system and
6    saying this system is good, go ahead and load the
7    product with a careless disregard of the safety of the
8    Lexington personnel.
9    Q    Let me ask you, Mr. Turner, I mean, I think
10   you agreed with me a minute ago that certainly the town
11   of Lexington had some responsibility to provide
12   protection for its employees who would be engaged in
13   the offloading of chemicals at its site?
14   A    I would agree with that to the extent that
15   had they been provided the proper training as to the
16   hazards that they were dealing with, I would agree with
17   it.
18   Q    All right. So do I understand your
19   testimony to be that the town of Lexington -- let's
20   just assume they're going to have some chemicals
21   brought in and offloaded at their site; right? Now,
22   let's say the chemical manufacturer doesn't provide
23   them with training, so the town of Lexington can just
24   stick their head in the sand and say, well, no one's
25   come in here and trained us, so we really don't care

Page 115

1    whether you have any protection or not Employee Joe
2    Jones. You just go out there and offload this stuff.
3    Do you think that's accurate? Do you think that's
4    okay.
5        MR. HALL: Let me object to form. You can
6    answer.
7    Q    Let me finish my question.
8        MR. HALL: I'm sorry. I thought you were.
9    Q    Is that okay, Mr. Turner?
10       MR. HALL: Objection to the form.
11   A    That was an awfully long question there.
12   You're going to have to repeat that for me, please.
13   Q    So the town of Lexington regardless of
14   whether the manufacturer comes in and trains it can
15   simply tell its employees you just go out over there
16   and offload these chemicals and don't worry about any
17   protection or instruction that they should give to
18   their employees?
19       MR. HALL: Objection to the form.
20   Q    Is that your testimony?
21   A    Again, you're distorting my testimony.
22   What my testimony is that Carus took on the
23   obligation as many chemical companies do. Many
24   chemical companies take on the obligation of training
25   when they are delivering a new product at their

Page 116

1    facility. When they take on that obligation they're
2    assuming the responsibility to train correctly in
3    accordance with a proper and I emphasize a proper MSDS.
4    Q    Did Carus provide the town of Lexington
5    with an MSDS on Totalox?
6    A    I believe they did, yes, sir.
7    Q    All right. And what sort of information is
8    conveyed in an MSDS?
9    A    First aid measures, respiratory hazards,
10   inhalation hazards which would be inhalation, ingestion
11   hazards, absorption hazards. It breaks down the
12   chemical properties. It gets into again first aid
13   measures, transportation, waste disposal, spill and
14   clean up procedures, leak and fire, things of that
15   nature. Chemical names, break down of the chemicals,
16   constituents and so forth.
17   Q    So if Carus had provided the MSDS to the
18   town of Lexington, don't you agree that Lexington would
19   have had responsibility to provide respiratory
20   protection for Mr. Machin?
21       MR. HALL: Objection to the form.
22   A    They had an obligation in terms of if Carus
23   had conveyed the correct information as to the MSDS's
24   hazards. Now, this particular system -- looking at my
25   background and past response life, if there was a

## Page 117

1   hazardous substance, hazardous chemical, hazardous
2   material, whatever you want to refer the term to, I
3   always identify it as hazardous, No. 1., meaning that
4   it's going to attempt to do harm to me or the people
5   that are working for me so we're going to protect
6   ourselves accordingly.  I look at the MSDS and as to
7   any reference on respiratory protection, that's if
8   you're dealing with a mist.
9        Okay.  In this particular case here in my
10  looking at that system would be completely substandard,
11  there's a high degree of a risk associated with a
12  release.  Therefore, I would have told my people make
13  sure that you have respiratory protection on, in place
14  before you start dealing with this if just by chance I
15  had to pressurize the line, which I wouldn't have
16  anyway.
17       Q   All right.  So you're not critical of Carus
18  for providing the town of Lexington with the MSDS?
19       A   No.  They did what they were supposed to do
20  by providing an MSDS.  Is the MSDS exactly accurate as
21  to the hazards?  I'm not an MSDS expert.  I know enough
22  about MSDS to deal with them in thousands of hazardous
23  material incidence over my career and I've seen
24  thousands of them, so I'm not an MSDS expert and I
25  would defer to the MSDS expert, sir.

## Page 118

1        Q    So they provided the MSDS.  You told me
2   what information the MSDS provides to the town of
3   Lexington, so I'm still trying to figure out if your
4   answer to this is yes or no.  Did the town of Lexington
5   have responsibility to provide respiratory protection
6   for its employees given the MSDS that was provided to
7   it about the chemical Totalox?
8        MR. HALL:  Objection to the form.
9        A   If they perceived it to be a hazard that
10  would escape its containment device, its package as
11  defined by DOT, but its containment device, if they
12  perceived it to be able to escape its package, then
13  they should have done the training, but the training
14  should have been directed by Carus because Carus did
15  not effectively train them on the hazards itself in
16  accordance with the MSDS.
17       Q    And I think you must have misunderstood my
18  question.
19       A   No, sir.  I understood it.  I'm just not
20  giving you exactly the answer you're looking for.
21       Q    Well, just hang on, Mr. Turner.  Don't get
22  excited.
23       A   No, sir.  I'm not excited.
24       Q    My question was not whether they should
25  have done training.  My question was should they have

## Page 119

1   provided Mr. Machin with the respiratory protective
2   equipment that you are critical of in one of your
3   opinions?
4        A   If they had a reasonable degree of belief
5   that that system could rupture and if they had known
6   about the hazards associated with that chemical, then
7   they should have provided respiratory protection
8   training, but that should have been directed by Carus
9   by Carus saying to these folks during their training is
10  that this presents a reasonable degree of respiratory
11  hazard and your system is substandard, so I want to
12  make sure that you folks understand is that you need to
13  get training under the APR standards.  APR, air
14  purifying respiratory.
15       Q    And I appreciate that.  If the town of
16  Lexington designed and built their own system they
17  still should rely on someone else to tell them whether
18  the system is substandard, is that what you're saying
19  or otherwise if they don't -- if no one else tells them
20  the system is substandard even though they designed and
21  built it, they have no obligation to protect their own
22  employees from a potential exposure to a chemical that
23  is identified on an MSDS which they have and which they
24  know is going to be offloaded on their site?
25       A   It goes back to the genesis of this is that

## Page 120

1   the system was substandard, so the training would have
2   obviously have been substandard because in addition to
3   they felt as though the system wasn't, so one person
4   who's a salesperson, profit over safety, the other
5   person who's a safety person is looking at it and
6   saying that the system should be revamped.  It should
7   be improved upon.  So I don't know if I'm really
8   answering your question.  It was kind of a long
9   question which is kind of hard to follow.  So if I
10  didn't, please let me know and I'll be happy to give it
11  another shot.
12       Q    Let me break it down for you.  We'll try to
13  make this easier.  Who do you understand designed and
14  built the system at the town of Lexington to receive
15  the storage units?
16       A   Yes, sir.  We discussed that and that was
17  Lexington.
18       Q    All right.  And since they designed and
19  built the system, should they bear any responsibility
20  in -- I mean, if the system is substandard as you've
21  opined?
22       A   Should they bear some responsibility in it?
23       Q    Sure.
24       A   I believe that they went to Carus and Carus
25  had looked at the system and Carus had stated to them

Page 121

1  that it was a sufficient system, the salesperson, so
2  that in my mind tells me that they felt as though it
3  was acceptable and that would take the liability from
4  them as far as I'm concerned.
5      Q    All right. Very good. Now, here's what I
6  want to make sure I'm understanding. It is your
7  opinion, Mr. Turner, that even if the town of Lexington
8  designed and built their system to store chemicals and
9  if that system is substandard as you've opined, they
10  bear no responsibility in designing and building a
11  substandard system that will house chemicals that they
12  receive which could injure their employees. Did I
13  state that correctly?
14     A    If the chemical company that is delivering
15  the chemical, that owned the chemical that's
16  transferring and manufacturing the chemical tells them
17  that that system is sufficient, then in my mind these
18  folks not being in the chemical industry would take the
19  advice of these people that are in the chemical
20  industry and look at that as being a sufficient system.
21  So I hope that answers your question, but I think at
22  that point there that the town of Lexington bears
23  little responsibility on this.
24     Q    How long was this system in existence
25  before this incident happened?

Page 122

1      A    I don't recall exactly what it was, sir. I
2  reviewed these documents quite some time ago.
3      Q    Sure. It had been in existence a long
4  time; hadn't it?
5          MR. HALL: Objection to the form.
6      A    Again, I don't recall exactly when, sir. I
7  reviewed these documents sometime ago.
8      Q    It's not important to you how long it's
9  been in existence; is it, Mr. Turner?
10     A    I didn't say that it was not important. I
11  just said that I don't recall, so, you know, how you
12  get that it's not important from don't recall.
13     Q    Well, I just assumed that if it was
14  important to you, you'd know it?
15     A    Once again, I don't recall.
16     Q    Is that an accurate assumption?
17     A    Once again I just don't recall. Was it a
18  year, two years? I just don't recall. If you give me
19  a second I might have it in my report here. No, sir.
20  I don't see it in my report at least in where it would
21  normally be up in the general description. I don't
22  see -- I don't see it in the report, but that being
23  said, you have recertification on maximum allowable
24  working pressures on tanks. It's not something that
25  gets a lifetime certification, so the carrier, the

Page 123

1  manufacturer of the chemical, the broker of the
2  chemical should have acquired as to the maximum
3  allowable workable pressure on that system. You don't
4  get something -- you don't get a maximum allowable
5  workable pressure from 1955 and expect here in 2013
6  that that system is still going to be stable. So I
7  don't know exactly what the assembly date, if you will,
8  of this makeshift system was, but it's really
9  irrelevant as to the maximum allowable working
10  pressure.
11     Q    I just want to make sure that when we stand
12  in front of jury -- you understand, Mr. Turner, we
13  stand in front of a jury. I want to accurately portray
14  what I understand your opinion to be as to the
15  responsibility of the town of Lexington with this
16  system that you call substandard and I want to be able
17  to tell the jury even that -- you find no liability and
18  responsibility on the town of Lexington or you opine
19  that they are responsible for designing and
20  implementing a substandard system. That's all I want
21  to know.
22         MR. HALL: Objection to the form.
23     A    Again, they are responsible for the design
24  and I've answered this many times. They are
25  responsible for the design. However, they are also --

Page 124

1  the carriers, the carrier, the broker, the manufacturer
2  of the material is responsible to at least find out at
3  a bare minimum what is the maximum allowable working
4  pressure of this system and not just go and hook it up
5  to any type of system that they have no idea. They
6  come down and they did an investigation on it where
7  they looked at it and they said that it was acceptable.
8  So in my mind it relieves the town of Lexington from
9  that liability because they are taking the word of a
10  reputable chemical manufacturer that they're dealing
11  with that is telling them that the system is
12  acceptable.
13     Q    All right. Well, let's move to your fourth
14  opinion because you say in your fourth opinion that the
15  Andersons should not have arranged or allowed for the
16  delivery of Totalox to this makeshift PVC manifold bulk
17  storage system. Now, I take it your opinion that they
18  should not have done it or should have suspended
19  delivery is based upon as you've told me earlier your
20  opinion that they should have had an advance inspection
21  of the system; correct?
22     A    Yes, sir.
23     Q    All right. And we've talked about that.
24  And that's the basis for your opinion in No. 4; am I
25  correct?

| Page 125 |
| --- |

1    A    Yes, sir.
2    Q    All right. Anything else?
3    A    No. No, sir.
4    Q    All right. The fifth opinion is that Carus
5    should not have allowed the delivery for the very same
6    reason; is that right?
7    A    Yes, sir.
8    Q    They should have known it was a substandard
9    system; is that correct?
10    A    They should have. Carus.
11    Q    All right. Carus. Your sixth one is that
12    Fetter should not have delivered to that same system
13    because they should have known; is that right?
14    A    That's correct.
15    Q    So you've got -- you're critical of the
16    Andersons for Golden Eagle. You're critical of Carus
17    and you're critical of Fetter; correct?
18    **A    It would have been a simple solution, sir.**
19    **Carus or one of the other companies, Golden Eagle,**
20    **Andersons, Fetter, they could have sent one individual**
21    **out there to represent all three players involved with**
22    **this and said inspect that, get a maximum allowable**
23    **working pressure from an engineer that has been**
24    **established by Lexington and once you receive that and**
25    **take a look at that facility, convey that information**

| Page 126 |
| --- |

1    **over to all three parties and we can go ahead and do**
2    **business.**
3    Q    Sure.
4    **A    But they didn't do that. Nobody did that.**
5    Q    You've said that several times. My
6    question is this, though. Just listen to my question.
7    A    I understood your question.
8    Q    You're critical of Carus. You're critical
9    of the Andersons and Golden Eagle. You're critical of
10    Fetter & Son, but you're not critical of the town of
11    Lexington.
12    **A    Sir, I said to you that they share some --**
13    **a minimal amount of liability on this because they**
14    **should have had this tank system certified for a maximum**
15    **allowable working pressure. They did not do that.**
16    **They should have had a marine chemist come or an**
17    **engineer that was capable of doing that, but they**
18    **didn't. Okay. But that liability diminished**
19    **substantially when Carus came in and said your system**
20    **looks good, to go ahead and load chemicals into. They**
21    **did that. Carus did that, not the town of Lexington.**
22    **So Lexington not being in the business of chemicals**
23    **would take it from a global corporation like Carus and**
24    **say that the system is adequate unless, of course, it**
25    **was a profit over safety mindset, a statement set by a**

| Page 127 |
| --- |

1    salesperson.
2    Q    Let me ask you this: On No. 7 you say the
3    undue and improper application of excessive pressure to
4    the PVC baffle by Weiser. Tell me how that occurred.
5    **A    Let me read this, sir. I'm sorry. Hold on**
6    **a second.**
7    Q    Sure.
8    **A    Repeat that question again, sir.**
9    Q    All right. Number 7, the undue and
10    improper application of excessive pressure to PVC
11    baffle system by Weiser was improper and unsafe. Tell
12    me what the basis of that opinion is.
13    **A    The basis of the opinion is the simple fact**
14    **that you had a rupture here on a PVC system that was**
15    **unacceptable. It's unacceptable to put a system in**
16    **like that without having again an MAWP that would**
17    **indicate that this system is capable of handling that**
18    **type of pressure.**
19    Q    So tell me why Mr. Weiser, whatever
20    Mr. Weiser did was improper.
21    A    He was the truck driver.
22    Q    What did he do that was improper?
23    **A    He was the truck driver and he applied**
24    **pressure to a system that should not have had pressure**
25    **on it.**

| Page 128 |
| --- |

1    Q    All right. And what's the basis of that
2    opinion other than your experience?
3    **A    My experience.**
4    Q    Right. Likewise, your opinion that he was
5    improperly trained or had improper experience is based
6    upon your experience as well; correct?
7    A    Yes, sir.
8    Q    And, again, you can't point me to an
9    industry standard or a learned treatise for that
10    opinion?
11    MR. HALL: Objection to the form.
12    **A    Well, you can go to various standards --**
13    **well, regulations. You can look at he's a tank truck**
14    **driver. Although, PHMSA is not going to apply to this**
15    **because it's pipeline -- it's pipeline and hazardous**
16    **material administration and it's dealing with the**
17    **transport of hazardous materials. It could certainly**
18    **be used as an industry guidance rather than a**
19    **regulation as to how you would train somebody. And in**
20    **that training you have what you call function specific.**
21    **Function specific on a cargo tank truck operator would**
22    **be the proper and improper application of pumping**
23    **systems.**
24    Q    Now, you go on to say in No. 8 that had
25    Mr. Weiser opted for the line option for clearing the

## Page 129

1  hoses, this wouldn't have occurred; correct?
2      A    That's correct.
3      Q    And other than your experience tell me what
4  industry standard or learned treatise supports that
5  opinion.
6      A    Once again this is 20-plus years worth of
7  industry experience of seeing these things without
8  incident occur hundreds of times and personally doing
9  it myself hundreds of times. Is there something
10 specific that's outside of API that's going to talk to
11 that? I don't believe so or none that I'm aware of.
12 There's not industry standards for everything that's
13 out there. I mean, the electrical industry doesn't
14 tell you not to lick your fingers and stick it in a
15 lock socket.
16     Q    Wow. Okay. Thank you. Number 10 is
17 Mr. Weiser, had he not violated his own company policy
18 as it pertains to the handling of customer's equipment,
19 it's likely this event would not have occurred. What
20 do you mean by that?
21     A    Well, that would have been as I said
22 earlier No. 26 under the company's -- under the
23 company's standards here or, excuse me, their procedure
24 for pumping off tank trailers. Number 26, the air is
25 present in your hoses. Shut the customer's tank

## Page 130

1  vessel. So, in other words, at the point where his cam
2  lock fitting was attached to the line, the pipeline,
3  the PVC pipeline, he should have shut that valve down
4  before attempting any kind of line clearing.
5      Q    All right. And do you know whether or not
6  he tried to do that?
7      A    No, he didn't. Other than that, you would
8  not have had pressure throughout the system where the
9  rupture occurred.
10     Q    All right. And Golden Eagle had no
11 responsibility for Mr. Weiser violating his own company
12 policy; did they?
13     A    Golden Eagle had no responsibility for
14 Mr. Weiser. I would say that they have -- no, sir. I
15 wouldn't see them having liability for that or I
16 should -- I apologize. I mean responsibility.
17     Q    You mean responsibility, right. They had
18 no responsibility for that; isn't that right?
19     A    That's correct. Well --
20     Q    I'm sorry?
21     A    -- they certainly could ask for a copy of
22 the standards, although it's not something that's
23 absolutely mandatory. In other words, their safety
24 protocol.
25     Q    Right. And brokers don't usually do that;

## Page 131

1  do they? You know that?
2      A    They do sometimes, but it's not a common
3  practice.
4      Q    Right. Now, on your No. 11 that Fetter
5  management should have either performed a bulk storage
6  facility risk assessment or requested the same from the
7  shipper. Is that getting back to what we've talked
8  about in length here about doing an advance inspection
9  of the system?
10     A    Sure. Just let me read this real quick if
11 you would, please.
12     Q    Sure.
13     A    Okay. I'm sorry. Repeat the question.
14     Q    Yeah. I mean, that's what we're talking
15 about in terms of doing an advance assessment that
16 you've talked about all morning this morning; right?
17     A    Yes, sir.
18     Q    Isn't that what you're talking about in
19 No. 11?
20     A    Yes, sir, risk assessment.
21     Q    Right. And we've talked about the basis
22 for your opinion for that; correct?
23     A    Yes, sir.
24     Q    Now, who's the shipper under No. 11?
25     A    The shipper is -- that would be Golden

## Page 132

1  Eagle. The carrier, the motor carrier would be Fetter.
2      Q    All right. Tell me why Golden Eagle would
3  be the shipper?
4      A    It depends on the relationships. It could
5  have actually been Fetter that's a shipper as well.
6  There could have been Carus as a shipper. It all
7  depends on the basis of the relationships and the bill
8  of lading.
9      Q    Well, tell me what the bill of lading says
10 in this case because I know you've got it because
11 you've provided me with a copy of it.
12     A    Yes, sir. Hold on just a second. Yeah.
13 The shipper's Golden Eagle Products which is the
14 Andersons.
15     Q    All right. So is it your opinion that the
16 shipper under your opinion No. 11 is Golden Eagle?
17     A    Well, that's what it says on the document,
18 yes, sir.
19     Q    I don't care what that says. I want to
20 know what you think.
21     A    I can't dispute what the document says.
22 They claim themselves as the shipper.
23     Q    Are you saying Carus is the shipper?
24 Fetter is the shipper? Golden Eagle is the shipper or
25 all three of them as the shipper?

## Page 133

1    MR. HALL: Objection to the form.
2    **A    Sir, I never said that. I don't -- it**
3  **depends on a relationship between a carrier and a**
4  **shipper and a manufacturer. Sometimes they can do**
5  **various things depending upon contractual**
6  **relationships. I'm not a contracts expert.**
7    Q    Is there a difference between a broker and
8  a shipper?
9    **A    At times.**
10   Q    Well, how about this time?
11   **A    I'm sorry. Was that a question?**
12   Q    Yes, sir. How about this one? How about
13  this system?
14   **A    Oh, I'm sorry. I didn't hear you. In this**
15  **here I would say that Golden Eagle was performing both**
16  **as a shipper as well as a broker.**
17   Q    How do you define broker?
18   **A    A broker for all intents and purpose is a**
19  **middleman.**
20   Q    How do you define a middleman?
21   **A    Middleman is somebody who makes the**
22  **relationship between a manufacturer and an end user.**
23   Q    How do you define shipper?
24   **A    A shipper at times would be that same type**
25  of relationship, that they are -- a shipper could be a

## Page 134

1  **manufacturer and in this case here Carus, excuse me,**
2  **Golden Eagle is both a manufacturer and a shipper.**
3  **That's why they took this title on as shipper because**
4  **they're both the manufacturer and the shipper because**
5  **under some type of license, whatever that agreement,**
6  **they were permitted to manufacture Totalox that was**
7  **patent owned by Carus.**
8    Q    How does the FOB --
9        MR. HALL: Hold on a second. He hasn't
10  finished his answer.
11   Q    -- affect the shipper or broker's
12  relationship?
13       MR. HALL: Objection to the form.
14   **A    Again, I can't answer that because it's**
15  **going to be dependent upon a contractual relationship.**
16  **I don't know what the contractual relationship was,**
17  **whether it was verbal, written or whatever.**
18   Q    All right. Any other opinions then that
19  you're going to render against Golden Eagle or the
20  Andersons that we have not discussed today?
21   **A    I have right to amend based on further**
22  **information in the future, but at this point, none.**
23   Q    And if you do amend and you do receive any
24  additional information which adds as an additional
25  basis for your opinions, you're going to let us know

## Page 135

1  that. Remember? Correct?
2    **A    Yes, sir. Yes, sir. Earlier I stated that**
3  **I did receive last night the David Patton deposition as**
4  **well as the engineering document.**
5        MR. BARROW: I know that my co-counsel has
6  some questions for you so temporarily at least I'm
7  going to turn it over to him.
8        EXAMINATION
9  BY MR. DAVISON:
10   Q    Good afternoon, Mr. Turner.
11   **A    Good afternoon, sir.**
12   Q    I introduced myself earlier. I'm Art
13  Davison and I represent Carus Corporation.
14   **A    Yes, sir.**
15   Q    Mr. Barrow has asked you a number of
16  questions about Carus and about the other parties in
17  the case. I don't mean to repeat anything he's already
18  asked you, but the questions that I'm going to ask now
19  are primarily focused on Carus Corporation. Okay?
20   **A    Yes, sir.**
21   Q    Now, you were asked earlier by Mr. Barrow
22  about your opinions on the risk assessment that you say
23  should have been done and we don't need to repeat all
24  of that, but you're of the opinion that Carus had a
25  duty to perform a risk assessment of the 12-mile creek

## Page 136

1  station; is that right?
2    **A    That's correct, sir.**
3    Q    And can you cite me to any federal or state
4  law, rule or regulation that would require Carus to
5  perform such an inspection in this case?
6    **A    To the best of my knowledge that I'm aware**
7  **of, I'm not an EPA expert or environmental expert with**
8  **EPA involvement or EPA from their perspective. I would**
9  **be very confident that there's something in there, but**
10  **I can't cite to because I am not an EPA expert.**
11   Q    Can you cite me to any industry standard
12  that's published anywhere that would have required
13  Carus to perform a risk assessment as you have
14  suggested?
15   **A    That as well. I don't know of any, but --**
16  **other than API and API is petroleum and I think that it**
17  **would at least be -- could be used as an opportunity**
18  **for a company that's going to be transferring chemicals**
19  **that they should have some type of -- at least be able**
20  **to use that as a learning tool as a standard of care**
21  **rather than a regulation.**
22   Q    Where does it say that the API standards
23  would apply to the delivery of a product such as
24  Totalox?
25   **A    It doesn't. It doesn't. It's strictly --**

## Page 137

1  it is petroleum only, but what I'm saying -- and it's
2  not regulation, but it is -- it's standards of care
3  that are adopted by FMCSA and OSHA and so forth, but I
4  don't think that there's nothing as far as it being --
5  as far as it being a recommendation from the industry
6  itself.  I apologize.  I'm kind of losing train of
7  thought there for a second.
8      Q    Let's suppose an inspection had been
9  conducted as you have suggested.  What are the criteria
10  for an inspection that you would find to be
11  satisfactory?
12      A    Well, some type of engineering
13  certification that's indicating that it's acceptable to
14  be able to withstand the pressures that the vessel
15  would undergo.
16      Q    Are you an engineer?
17      A    No, sir.
18      Q    Are you a chemist?
19      A    No, sir.
20      Q    Do you have any formal training in either
21  one of those disciplines?
22      A    No, sir.  Other than hazardous materials,
23  emergency response, no, sir.
24      Q    Who would set the criteria for an
25  inspection that would meet your standards?

## Page 138

1      A    A marine chemist would be appropriate for
2  something like that, a marine chemist to come in and in
3  this particular case they could have retained -- one of
4  the defendants could have retained a marine chemist
5  and/or an engineer which often are the same, one in the
6  same to go out and inspect the tank system to be able
7  to make sure that it's acceptable to be able to accept
8  the product.
9      Q    And this is your opinion as to what should
10  have been done?
11      A    Well, I'm very familiar with working with
12  marine chemists and applications such as this, so
13  that's why I'm basing that on experience.
14      Q    Other than your experience, you have no
15  other authority for that suggestion; is that correct?
16      A    No, sir.
17      Q    Is what I said correct?
18      A    Correct, sir.
19      Q    Thank you.  Now, I'm looking at page 4 of
20  your report, the third paragraph.  Are you with me?
21      A    Give me one second, please.  Okay.  I'm
22  there.
23      Q    All right.  You say in the first sentence
24  that the advance team would visually inspect the bulk
25  storage receiving vessel soundness.  What are the

## Page 139

1  criteria for certifying the vessel soundness?
2      A    Documents.  Documents.
3      Q    What documents?
4      A    Documents from an engineering firm,
5  documents that would establish a work -- maximum
6  allowable working pressures and such.
7      Q    What are the criteria that would establish
8  a satisfactory piping criteria?
9      A    Again, those would fall under API and a
10  marine chemist would apply API standards to pressures
11  within systems as far as pressures in pipelines.
12      Q    Well, I thought API standards didn't apply
13  to a product like Totalox?
14      A    They don't, but I'm saying to use it as a
15  basis for determining the ability to withstand certain
16  pressures.
17      Q    Would you be qualified to conduct an
18  inspection like the type you're suggesting Carus should
19  have performed?
20      A    Strictly visually, but not as to
21  establishing MAWPs.
22      Q    Later on, on page 4 you quoted a link from
23  the deposition of Mr. Bob Myers; is that right?
24      A    Yes, sir.
25      Q    And I'm looking at your next to last

## Page 140

1  paragraph.  You state in the second sentence that
2  Mr. Myers is of the opinion that the tote system was
3  substandard; don't you?
4      A    I'm sorry.  Where exactly are you, sir?  On
5  page 4?
6      Q    Yes, sir.  The next to last paragraph.
7      A    Right.  Okay.  I've got it.
8      Q    The second sentence.  You make the
9  statement that in doing so Mr. Myers is of the opinion
10  that the tote system was substandard; right?
11      A    I'm not reading that on that second to last
12  paragraph.
13      Q    What is the next to last paragraph start
14  with on your copy?
15      A    "In deposition testimony Myers testifies
16  that he as the representative for Carus visited the
17  site of the subject lawsuit."
18      Q    Yeah.  And then read the next sentence.
19      A    All right.  "In doing so Myers is of the
20  opinion that the tote system was substandard."  Oh,
21  yes.  Okay.  I apologize.  Go ahead.
22      Q    All right.  My question is based on that
23  statement by you.  Where in his deposition does
24  Mr. Myers state that the tote system was substandard?
25      A    Right here where it says -- the question is

Page 141

1    asked, "Was the system that the town had set up to
2    receive this product in bulk an adequate system to
3    you?"
4          And he answers, "I would have
5    recommendations of a better system."  In my mind that
6    recommendation of a better system is substandard,
7    otherwise why recommend.
8    Q    The word "substandard" is actually your
9    word, not Mr. Myers' word; isn't that correct?
10   A    That's correct.  It's my interpretation of
11   what he's saying.
12   Q    In using the word "substandard," that
13   implies that there is a standard that needs to be met;
14   correct?
15   A    Without a maximum allowable working
16   pressures, then there would be standards that are
17   required to be met.
18   Q    All right.  First of all, tell me what the
19   standard is for this particular delivery system that
20   was not met?
21   A    As far as the baffling system?
22   Q    Any aspect of it that you think is
23   substandard tell me about.
24   A    Just by the mere fact that he had a rupture
25   of the pipeline would be one in and of itself, but as

Page 142

1    far as a document that says that using PVC piping that
2    is put together by folks that may or may not know about
3    maximum allowable working pressures and certifying the
4    system, I can't answer that.
5    Q    Well, the fact that there is no standard
6    for a storage system such as the one in use at the
7    12-mile creek; correct?
8    A    There are standards out there.  There are
9    standards out there that would -- for pipeline systems
10   and they are under PHMSA, some of them actually.
11   Q    What are those standards and where are
12   they?
13   A    Again, I don't have them in front of me.
14   Q    Well, I'm not asking you whether you have
15   them in front of you or not.  The question is who
16   publishes those standards?  How can I find them?
17   A    First off, API, American Petroleum
18   Institute is going to have -- they are for petroleum,
19   though.  As far as how pipelines are going to be
20   structured and how they're going to be pressure tested
21   and so forth, API have standards such as that, but,
22   again, it's for petroleum.  Could it be used in other
23   applications?  Sure, it can.
24   Q    Well, so the answer to my question is that
25   there is no published standard for the piping system in

Page 143

1    a storage system like this; is there?
2    A    There is, but there's nothing in front of
3    me right now.
4    Q    Well, where is it located then other than
5    the API, which you have already testified doesn't
6    apply?
7    A    I would have to go back and that would have
8    to be an amendment on my report.  PHMSA is where I
9    would look for that.
10   Q    What's PHMSA?
11   A    Pipeline and Hazardous Material Safety
12   Administration.
13   Q    Any other standards that apply to this
14   storage system that it failed to meet other than the
15   PVC piping not being rated for the air pressure that it
16   was put under?
17   A    I apologize.  I was writing something down
18   there because I want to look into that further.  Once I
19   get done reviewing this other deposition I want to make
20   sure that I likely amend the report and provide that at
21   a later point from PHMSA standards.
22        Could you repeat that question, please?
23   Q    What else other than the ability of the PVC
24   pipe to withstand air pressure was substandard about
25   this storage system at 12-mile creek?

Page 144

1    A    I just think that the configuration and
2    they should have had -- they should have acknowledged
3    that if you're not gravity feeding into an underground
4    storage tank and you're pressure feeding into an
5    above-ground storage tank that you have to realize the
6    head pressures that you're facing and that system there
7    would just be substandard just by looking at it without
8    even having to get into engineering issues as far as
9    working pressures and so forth.
10   Q    Other than Mr. Myers testifying that he
11   would recommend a better system, is there anywhere else
12   that he or Mary Ellisor state that this system was
13   unsafe or hazardous?
14   A    No.  Other than the employees that are
15   coming from a major corporation saying that the system
16   seem to be acceptable, I can't point to anything.
17   Q    You state in your last paragraph on page 4
18   that Carus made its own findings of inadequacy; don't
19   you?
20   A    Yes, sir.
21   Q    Who said that the system in place with the
22   PVC pipe was inadequate from Carus?
23   A    Well, I rely on the testimony again of
24   Myers where he says that I would have made
25   recommendations of a better system.  I think that in my

| Page 145 |
|---|

1  mind that's pretty substantial.

2      Q   Are there any other flaws in the system at

3  12-mile creek that you're critical of that we haven't

4  talked about today?

5      A   **No, sir, not that I can think of right now.**

6  **I think between both attorneys there, I think we**

7  **covered just about everything.**

8      Q   And you cannot point me to any federal law

9  or state law, rule or regulation that that storage

10  system violated; correct?

11      A   **Again, this is going to fall under API and**

12  **I realize that that's petroleum, but if this is not**

13  **petroleum and that API is petroleum-related, it could**

14  **have certainly be used as guidance in establishing an**

15  **effective system. I think that the PHMSA -- I'm not a**

16  **pipeline expert, but I certainly have experienced, you**

17  **know, 20-plus years of experience of dealing with**

18  **pipeline ruptures and so forth, but as to being an**

19  **expert under pipeline issues, I am not, but I am -- as**

20  **far as cargo tank truck under PHMSA, I am an expert, so**

21  **I hope that answers your question.**

22      Q   How often would a manufacturer like Carus

23  be required to inspect this system in your view?

24      A   **Again, that would be a pipeline issue that**

25  **I don't know what the inspection intervals are.**

| Page 146 |
|---|

1      Q   Do you know how many loads of Totalox were

2  received at the 12-mile station in this configuration

3  before the incident occurred in April of 2010?

4      A   **Well, the same as the question earlier on**

5  **about the age of the system. I recall reading**

6  **something about that, but I don't recall the specifics**

7  **on it.**

8      Q   Do you know how many loads had been safely

9  received in that system before the date of the

10  incident -- before the date of this incident without

11  any problem?

12      A   **No, sir, I don't. I just don't recall that**

13  **number.**

14      Q   Well, if we assume for purposes of the

15  question that a number of loads had been successfully

16  offloaded there without any incident, how was that done

17  if you contend the system was substandard?

18      A   **It's the same theory as taking a commercial**

19  **motor vehicle driver and running him down the road and**

20  **saying he successfully has driven 250,000 miles, but he**

21  **wrecked at 251,000 miles. It doesn't necessarily make**

22  **him a -- where he may now be considered a substandard**

23  **driver. So I really don't know how, you know, how to**

24  **answer that question other than the demonstration I've**

25  **given or the example.**

| Page 147 |
|---|

1      Q   Well, isn't it likely that the drivers who

2  unloaded the previous loads cleaned out their hoses

3  after the hoses were disconnected from the PVC pipes?

4      A   **Did they clean out the hoses you're saying?**

5  **I'm sorry.**

6      Q   I said isn't it likely since something like

7  this had not happened before --

8      A   **Right.**

9      Q   -- that the previous deliveries, the

10  previous drivers cleaned out their hoses after they

11  were disconnected from the PVC pipes?

12      MR. HALL:  Objection to the form.

13      A   **I don't know how the previous drivers had**

14  **cleaned them, whether they walked the line or how they**

15  **did it, but I would assume -- I don't like to assume,**

16  **but my educated guess is that they likely wound up**

17  **walking the line or they put minimal pressure on it in**

18  **order to at least be able to get their line somewhat**

19  **cleaned out. But I don't know how high that pump**

20  **system on that tank truck can get up to as far as PSIs**

21  **are, so I really can't answer that question. I don't**

22  **know the history of other drivers coming into there,**

23  **what they did or did not do.**

24      Q   All right.  This accident happened because

25  Mr. Weiser was cleaning out his hose with the use of

| Page 148 |
|---|

1  air pressure while the hose was still connected to the

2  PVC pipe; right?

3      A   **That's correct.**

4      Q   And you don't have to do it that way; do

5  you?

6      A   **As I said earlier, you could break the**

7  **lines and you could walk the lines on it which really**

8  **would have been the safer option.**

9      Q   And if you do it that way, the way that you

10  just suggested, then you're not going to have this

11  incident happen; are you?

12      A   **I believe you would not have had it happen.**

13  **I don't think you would have seen it happen.**

14      Q   All right.  So there is a safe way to use

15  this system; isn't there?

16      MR. HALL:  Objection to the form.

17      A   **It's going to depend on how you're going to**

18  **parse out PSIs. I mean, how many pounds per square**

19  **inch are you applying to the system? Was it prior**

20  **deliveries? Were they other cargo tank trucks owned by**

21  **the company or was it the same tank truck? You know,**

22  **various drivers do different things, so it's very hard**

23  **to put your finger on that with any degree of**

24  **specificity.**

25      Q   Well, let me see if I can ask you a

| Page 149 |
| --- |

1   question that you can answer yes or no, Mr. Turner.
2       A   Okay.
3       Q   Is it possible for a driver to have
4   unloaded a load of Totalox at this station safely?
5       A   Well, obviously, they've had loads here
6   prior, so they were able to offload safely.  I would
7   agree with that.  Not necessarily does that make it a
8   safe system, though.
9       Q   Do you consider yourself an expert in OSHA
10  regulations?
11      A   As I've stated earlier, there are specific
12  OSHA regulations that cross over into tank
13  truck-related matters and/or trucking matters that I do
14  consider myself an expert in, yes, sir.  Not the entire
15  OSHA standard, though.  Not the entire OSHA standard or
16  regulation.
17      Q   Do you consider yourself an expert in OSHA
18  hazardous communication standards?
19      A   I've got -- as I stated earlier on
20  1910.1200 I've got a real good working knowledge of
21  that.  As it pertains to development of MSDSs, I would
22  say no, I'm not an expert, but I've got a very good
23  working knowledge of it and the training requirements
24  that go along with that.
25      Q   Have you seen the labels that are attached

| Page 150 |
| --- |

1   to the sides of some of the Totalox totes at the
2   12-mile station?
3       A   Yes.  I have seen them in photographs, sir.
4       Q   Do you agree that those labels say "Avoid
5   breathing mist and use respirator"?
6       A   Let me just review the label real quick,
7   sir, if you would allow me.  Yes.  I do recall that,
8   but it's going to be on -- I believe that was under
9   fire and spill or something to that effect.
10      Q   Well, I'm looking at the right-hand side of
11  the label under handling and storage.  Do you see that?
12      A   Yes, sir.
13      Q   In the second sentence does it say "Avoid
14  breathing mist"?
15      A   Yes, it does.
16      Q   Does it say "Use respirator" right after
17  that?
18      A   It does.
19      Q   Anything confusing about that to you?
20      A   No, sir.
21      Q   And to the left of that column at the
22  bottom does it say, "Read material safety data sheet
23  before using this product"?
24      A   Yes, sir.
25      Q   Anything confusing about that sentence to

| Page 151 |
| --- |

1   you?
2       A   No, sir.
3       Q   What duty does an employer have to provide
4   respirators for its employees?
5       A   If they're going to be exposed by potential
6   respiratory hazardous under 1910.134 then it's required
7   that they provide the respirators as well as have them
8   fit checked if they're a negative pressure type
9   systems.
10      Q   And that's the duty under OSHA; isn't it?
11      A   It is, sir.
12      Q   Is that a duty that the employer can assign
13  to somebody else?
14      A   No, sir.
15      Q   What duty does an employer have to train
16  its employees in how to use a respirator?
17      A   They have to train -- they have to train
18  under 1910.134.
19      Q   Is that a duty they can assign to somebody
20  else?
21      A   If you have a third-party coming in and
22  doing the training, yes, you can.
23      Q   So the employer's no longer responsible for
24  making sure they're trained?
25      A   I didn't say that.  I said that you can

| Page 152 |
| --- |

1   bring in a third-party to do the training for you.  You
2   still maintain the liability and the responsibility.
3       Q   The employer's still responsible for making
4   sure that the appropriate training has taken place;
5   correct?
6       A   That's correct.
7       Q   Now, do you take the position, Mr. Turner,
8   that Carus owed a duty to train each employee of the
9   town about how to use a respirator with Totalox?
10      A   No.  I think that they gave a false sense
11  of security based on the system which would to me would
12  indicate to me that the system would not be involved in
13  any type of a mist-type scenario.
14      Q   How did they tell that there would never be
15  a mist type of scenario?
16      A   If it's an enclosed type system.  If it's
17  an enclosed type system where you're pumping this
18  material into these totes, essentially you're looking
19  at somewhat of a closed loop -- not closed loop, but a
20  closed system.  That would tell me that you would
21  likely not be exposed to any type of mist or vapors
22  unless you had a rupture which -- it's perceivable that
23  you could have a rupture on this system based on the
24  design of the system.
25      Q   And if Terry Weiser does his job properly,

## Page 153

1  you're not going to have a rupture; are you?
2      **A    If Terry Weiser did his job properly, I**
3  **would agree with that.  And if he followed his**
4  **company's safety policies, I would agree with that,**
5  **yes, sir.**
6      Q    All right.  You agreed with me a moment ago
7  that Carus did not have a duty to train each individual
8  employee; correct?
9      **A    Well, I believe that they took on that**
10  **responsibility to train the employees when they brought**
11  **Totalox on board.**
12      Q    And my question is did they have a duty to
13  make sure that each individual employee was trained by
14  them?
15      **A    No, sir.**
16      Q    All right.  So what was the extent of their
17  training duty then?  If it was not to train each
18  individual employee, who did they have to train in your
19  view?
20      **A    Well, the only training that would come --**
21  **unless there was an agreement between the two companies**
22  **that they were going to take on the training, then they**
23  **would have an obligation and duty to train effectively**
24  **and correctly.**
25      Q    Is there any federal law, rule or

## Page 154

1  regulation or state law, rule or regulation that places
2  a duty on Carus to train the employees of the town of
3  Lexington?
4      **A    None to the best of my knowledge unless**
5  **there was a contractural relationship, but none as far**
6  **as a regulatory -- from a regulatory standpoint.**
7      Q    I already reviewed that you think
8  do not consider yourself an expert in MSDS's; is that
9  right?
10      **A    I've got a very good working knowledge of**
11  **them for many years, but no, I don't consider myself an**
12  **MSDS expert.**
13      Q    Are you giving an opinion here one way or
14  the other as to whether the Carus MSDS complied with
15  all applicable federal and state rules and regulations?
16      **A    No, sir.**
17      Q    Are you giving an opinion about whether or
18  not the Totalox table applied -- complied with
19  applicable state and federal rules and regulations?
20      **A    No, sir.**
21      Q    You testified earlier that you had never
22  had any personal experience with Totalox; right?
23      **A    That is correct.**
24      Q    But you had some experience with sodium
25  permanganate?

## Page 155

1      **A    Yes, sir.**
2      Q    Was that in a powder form, a liquid form or
3  what?
4      **A    A liquid form.  I don't believe that I've**
5  **ever dealt with it in any kind of solid form.  It's**
6  **always been a liquid phase.**
7      Q    And what was the product that you were --
8  explain to me how you dealt with sodium permanganate in
9  liquid form?
10      **A    Leaking vessels in the back of trailers.**
11      Q    And what concentration of sodium
12  permanganate was that?
13      **A    I don't recall.  You're looking back, you**
14  **know, at a 20-plus year career, so I just don't -- I**
15  **can't tell you being in the back of a trailer what the**
16  **percentages were.  I just don't know.  I just don't**
17  **recall.**
18      Q    All right.  And tell me a little bit more
19  about what that situation was.  You say it was leaking
20  in the back of a trailer.  What does that mean?
21      **A    Van trailers.  Truck drivers driving down**
22  **the road and he has drums in the back of it or**
23  **containers, poly drums and a nail works its way up from**
24  **the pallet and punctures a hole in the drum or totes.**
25  **I've responded to hundreds of tote incidence and I do**

## Page 156

1  **recall having a couple of those as a sodium**
2  **permanganate incidence.  Potassium permanganate and**
3  **permanganate type materials.**
4      Q    And this was some sort of solution and you
5  don't know what the concentration was?
6      **A    Oh, no, sir.  No, I don't.**
7      Q    And you don't recall any tradename
8  associated with that solution?
9      **A    No, sir.**
10      Q    Like Equinox or something?
11      **A    No, sir.  These would have been directly**
12  **for chemical corporations that manufactured that sent**
13  **it to another location to have it mixed into a batch of**
14  **something else.**
15      Q    Were these situations where you actually
16  went to the scene where the leaking totes were located?
17      **A    Yes, sir.**
18      Q    Did you go inside the van where the leaking
19  totes were located?
20      **A    Yes, sir.**
21      Q    Did you sustain any injury from your sodium
22  permanganate or potassium permanganate exposure on
23  those occasions?
24          MR. HALL:  Objection to the form.
25      **A    I've never been exposed, injured or exposed**

## Page 157

1  to any type of chemicals nor the folks working for me.
2      Q    All right.  Well, I understand that you
3  went into the back of a van where there were drums with
4  leaking sodium permanganate; right?
5      A    Yes, sir.
6      Q    Were you wearing respiratory protection?
7      A    We were wearing chemical protective
8  clothing and respiratory protection, SCVAs.
9      Q    How long ago did this event occur?
10     A    Well, it's not just one.  There were
11 multiple over years.  I mean, it's not just one event.
12 We've had multiple.
13     Q    When was the most recent one?  When was the
14 most recent one?
15     A    I would say north of five years ago.  Well,
16 more than that actually.  North of seven, eight years
17 ago and less than 15 years ago.  I can't even give you
18 a definitive date or year or something like that.
19 Those notes have all been destroyed.  Excuse me, those
20 records have all been destroyed and they no longer
21 exist.
22     Q    Before you went into the van with the
23 leaking drums of sodium permanganate did you read the
24 MSDS on the product?
25     A    Often we wouldn't use a MSDS out in the

## Page 158

1  field.  We would get into more in-depth information.
2  We would deal with things called like the CHRIS manual,
3  SACS manuals, various forms of information out there
4  that are chemical research materials.  We would also
5  have computer software that we could plug in the
6  chemical name and it would give us specifics on the
7  chemical as far as the hazards are concerned and so
8  forth.
9      Q    Do you have any training, education or
10 experience in the subject of chemistry as it applies to
11 sodium permanganate?
12     A    Not specifically to sodium permanganate,
13 no, but I do have some degree of training in chemistry.
14     Q    What degree of training is that?
15     A    Not degree as in education, but we would
16 spend considerable amount of time in training through
17 technician training on chemistry as well as I've taken
18 other courses that would pertain to chemistry type
19 related scenarios dealing with chemicals -- chemistry
20 involved with hazardous materials response.
21     Q    But not as it relates to sodium
22 permanganate?
23     A    Not specific.  When you're training --
24 unless you're a manufacturer -- if you're a
25 manufacturer of a chemical, you'll do specific

## Page 159

1  training, but because of emergency response you could
2  be dealing such a wide array of different type
3  chemicals from a day-to-day basis day in and day out.
4  You have to generalize in your training, so you're
5  learning about corrosives in a chemistry standpoint,
6  from a chemistry standpoint such as flammables and
7  oxidizers, et cetera.
8      Q    Do you have any training, education and
9  experience in medicine?
10     A    Oh, no, sir.
11     Q    Do you have any training, education and
12 experience in the subject of industrial hygiene?
13     A    Limited.
14     Q    Limited to what?
15     A    Industrial hygiene in the one training
16 course that we had discussed earlier which the site
17 safety supervisor and the hazardous waste site
18 inspection personnel, you get into some degree of
19 industrial hygiene aspects as well as a technician
20 training.  There's some degree of hygiene aspects as
21 well predominantly through decontamination type
22 methodologies.
23     Q    Are you an expert in industrial hygiene?
24     A    No, sir.
25     Q    Do you have any knowledge of the chemical

## Page 160

1  Totalox outside of the MSDS?
2      A    As I've stated earlier the times that I've
3  responded to them, we would have used things such as
4  the CHRIS manual or CAMEO or Chemtox, even getting into
5  Sacs manuals and so forth.  Even the Coast Guard or,
6  excuse me, NFPA, hazardous material books and so forth,
7  so it's a wide array of different research materials
8  that we would use on an incident.
9      Q    I don't think you understood my question,
10 Mr. Turner.  I was limiting this particular question to
11 Totalox, not sodium permanganate generally.
12     A    Oh.
13     Q    Outside of the MSD --
14     A    I apologize.
15     Q    Outside of the MSDS -- that's right.
16 Outside of the MSDS that you read on Totalox, do you
17 have any other knowledge about that particular product?
18     A    Oh, no, sir.  No, sir.
19     Q    Now, about your opinion on Totalox's duty
20 to train -- excuse me, Carus's duty to train the people
21 at the town of Lexington.  What sort of form should
22 that training take?
23     A    As far as Lexington -- I'm sorry.
24 Lexington training their personnel, was that the
25 question?

## Page 161

1    Q   No, sir. No, sir. You've testified that
2 you think that Carus had a duty to train the people at
3 the town of Lexington about Totalox.
4    **A   No.**
5    Q   The usage of Totalox.
6    **A   I think that they assumed that duty when**
7 **they went in and trained their personnel. That was**
8 **their decision and I believe that they transferred that**
9 **liability once they took on that training.**
10    Q   And what form should that training take?
11    **A   1910.1200, hazard communication standards**
12 **dealing with the system itself; in other words, pumping**
13 **off the product, handling the product.**
14    Q   Any other guidelines for the form that the
15 training should take other than the 1910.1200
16 standards?
17    **A   Well, general safety with the material**
18 **itself. I mean, that really is all going to fall**
19 **pretty much under 1910.1200 in training of the**
20 **employees. And then storage and so forth may have been**
21 **part of the training as well.**
22    Q   So if they provided the information
23 required by 1910.1200, they would have met the training
24 requirements in your view?
25    **A   Yes. As far as 1910.1200 is concerned, but**

## Page 162

1 **if they took on other training of which I'm not aware**
2 **of, if they took on other training obligations; in**
3 **other words, approving of a system, a storage system or**
4 **a pipeline system then likewise would have been their**
5 **responsibility as well.**
6    Q   Having read Mr. Myers' deposition you are
7 aware that he has testified that he did train people at
8 the town of Lexington under 1910.1200; aren't you?
9    **A   Yes, sir.**
10    Q   What was inadequate about the training that
11 Mr. Myers provided?
12    **A   I wasn't there, so I have not seen a**
13 **syllabus on it. I don't know the extent that he went**
14 **into 1910.1200, whether he covered it effectively or**
15 **not. So unless I saw a syllabus, I really can't opine**
16 **on that.**
17    Q   If the town hires a new employee after
18 Mr. Myers leaves, who's responsible for training that
19 new employer about Totalox?
20    **A   That would be the company, the company to**
21 **assure that the individual's trained, but if you have**
22 **an outside entity that's going to be doing that**
23 **training such as in this case here, that would be their**
24 **responsibility. Well, if that's the contractual**
25 **arrangement or the agreement.**

## Page 163

1    Q   What's the agreement here?
2    **A   I don't know.**
3    Q   All right. Are you suggesting that if
4 Myers leaves and the next day the town hires a new
5 employee that Mr. Myers has to come back and train that
6 employee?
7    **A   No, sir. I'm not saying that. If**
8 **Mr. Myers -- Mr. Myers did the training, so I don't**
9 **quite understand the question because Mr. Myers did the**
10 **training for the 1910.1200 employees. Mr. Myers is**
11 **with Carus, so if he leaves, I don't understand if**
12 **another employee comes in. I'm not quite understanding**
13 **your question.**
14    Q   Well, Mr. Myers came to the town of
15 Lexington and performed the training there.
16    **A   Correct.**
17    Q   Isn't that your understanding?
18    **A   Yes, sir.**
19    Q   Mr. Myers doesn't live in Lexington. He
20 lives somewhere else?
21    **A   That's correct. Ohio, I believe.**
22    Q   So he comes to Lexington, performs
23 training, and then leaves and goes back to where he's
24 from.
25    **A   Right.**

## Page 164

1    Q   And the town hires a new employee, who's
2 responsible for training that new employee when
3 Mr. Myers isn't there?
4    **A   Well, ultimately it's still the**
5 **responsibility of the employer, in this case Lexington.**
6    Q   The town?
7    **A   Yes, sir.**
8    Q   I'm trying to find out if you're saying
9 that Mr. Myers needs to come back each time they hire a
10 new person and train that person.
11    **A   No, of course not unless they have a**
12 **relationship and that's part of the arrangement which I**
13 **have no reason to understand or believe one way or the**
14 **other.**
15    Q   Let's look at your report on page 13,
16 please.
17    **A   Okay.**
18    Q   I'm sorry. Let's go back for one second to
19 page 5 of your report, please.
20    **A   Okay.**
21    Q   Are you there?
22    **A   Yes, sir.**
23    Q   That top paragraph you state that Carus
24 allowed their Toller to deliver the chemical in spite
25 of the noted risk. Do you see where you say that?

Page 165

1     A    Yes, sir.
2     Q    What are the noted risks that you're
3  talking about?
4     A    It would have been through deposition,
5  deposition of where Mr. Myers had stated that he was of
6  the opinion -- well, not the -- where he had stated
7  again I would have made recommendations of a better
8  system. That right there in my mind tells me that he
9  identified that system as being substandard or
10 insufficient.
11    Q    Well, your use of the term "noted risks"
12 suggest to me that you're saying that there's a
13 specific particular risk that Mr. Myers was aware of.
14 Are you saying that?
15    A    I think in totality he's looking at that
16 system and seeing it as being as unsufficient and that
17 would be risk that he saw that this system needed to be
18 upgraded, so I believe that that was his noted risk. I
19 mean, that would be the noted risk. Does he
20 specifically identify the risk? Does he specifically
21 say that the unions by the PVC elbows was not
22 substantial or anything like that, no, but I think in
23 totality he's looking at that system and realizing that
24 that system is insufficient.
25    Q    All right. Let's go to page 13.

Page 166

1     A    Okay.
2     Q    Paragraph 9.
3     A    Okay.
4     Q    You state, "It is my opinion that Carus
5  knew that the makeshift manifold PVC bulk storage
6  system may experience a rupture." Why do you say that?
7     A    Based on the fact of Mr. Myers' testimony.
8     Q    Based upon him recommending a better
9  system?
10    A    Yes, sir.
11    Q    Anything else he said other than that?
12    A    If you'll bear with me just one second, I'm
13 going to just reread his testimony. Here it is. He
14 says in his testimony I believe there are documents
15 where he made recommendations.
16    Q    What page are you on?
17    A    Page 4.
18    Q    Okay. You're looking at your report?
19    A    Yes, sir.
20    Q    Not his deposition.
21    A    That's correct. Well, it's from his
22 deposition.
23    Q    Other than him saying that he made
24 recommendations of a better system, did he ever say
25 that he knew that they might experience a rupture

Page 167

1  there?
2     A    No, but it would indicate what would be the
3  other reason for -- what would be the other reason.
4  There's no other reason to have to replace the system
5  unless you knew that that system was potentially going
6  to fail.
7     Q    Did anybody else with Carus ever testify
8  that they foresaw the possibility of a rupture such as
9  what happened?
10    A    I think that you can define the word
11 "rupture" as spill, release. Maybe it was not an
12 artful term where it should possibly say release rather
13 than rupture, but regardless, it was a spill and a
14 spill that caused injury.
15    Q    In the next sentence you say that the
16 people at Carus knew an imminent risk of a rupture
17 existed; do you not?
18    A    Yes, sir.
19    Q    Where do you come up with that information?
20    A    You're on No. 9; correct?
21    Q    Yes, sir.
22    A    Again, if Mr. Myers didn't feel as though
23 that that system -- if he felt that system was
24 sufficient to be able to support the pressures and it
25 had a maximum allowable working pressure assigned to

Page 168

1  it, then I don't think that he would have even thought
2  about requesting that the system be redesigned, but
3  based on the fact that -- based on the fact that he had
4  recommended that the system be redesigned or -- I can't
5  remember the exact word he used, but based on that fact
6  that is telling me that he saw the potential of a
7  failure of the system.
8     Q    So in your mind his statement that he would
9  have made recommendations of a better system is the
10 same thing as knowing an imminent risk of rupture
11 existed?
12    A    To a large extent.
13    Q    Paragraph 12 on page 13. You come to a
14 conclusion about Carus's motives and you say that
15 knowing what they knew about the system. Did Carus
16 know anything more about the system that you haven't
17 already talked about today?
18    A    No. I think we covered -- we covered
19 especially Mary Ellisor, her opinions as to the system
20 being -- what she perceived to be as acceptable and
21 Mr. Myers' feelings as though the system needed to be
22 redesigned.
23    Q    After graduating from high school have you
24 had any formal education other than the courses that
25 you took to obtain the various certifications that

| Page 169 |
| --- |

1  you've testified about?
2  **A    No, sir.**
3  Q    On page 14 of your report you list your
4  references?
5  **A    Yes, sir.**
6  Q    Are these the only outside sources that you
7  have consulted in arriving at your opinions?
8  **A    Yes, sir.**
9  Q    Why did you consult Black's Law Dictionary?
10  **A    I have that in there because sometimes if**
11  **there's something in there from legal counsel, maybe**
12  **something I don't understand, I will reference it.**
13  Q    I don't see OSHA listed here.  You didn't
14  consult OSHA?
15  **A    No, sir.**
16  Q    You testified earlier that Mr. Weiser
17  violated Fetter's policy No. 26; right?
18  **A    Yes, sir.**
19  Q    And you testified that if he hadn't done
20  that this wouldn't have happened; right?
21  **A    I don't believe that it would have, no,**
22  **because you would not have had pressure where the**
23  **failure was.**
24  Q    Why do you believe Carus should have
25  foreseen that Mr. Weiser would violate Fetter's policy

| Page 170 |
| --- |

1  No. 26?
2  **A    Why do I -- I apologize.  I missed the**
3  **question.  I was drifting there for a second.  Can you**
4  **repeat that, please?**
5  Q    Yes.  Do you think Carus Corporation should
6  have foreseen that Terry Weiser would violate his
7  employer's policy No. 26?
8  **A    No, sir.  I don't believe that they should**
9  **have been able to foresee that.**
10  Q    Have you looked at the report that
11  Mr. Matthew Parker prepared in this case?  He's the
12  defendant's industrial hygienist.
13  **A    It doesn't sound familiar.**
14  Q    Do you consider yourself qualified to
15  critique the report of an industrial hygienist?
16  **A    No, sir.  In addition, looking at my report**
17  **on that, I did not review his deposition, but as far as**
18  **critiquing an industrial hygienist's report, no, sir.**
19  **I don't think that I am qualified to do that.**
20  MR. DAVISON:  I don't think I have any
21  other questions for you, Mr. Turner.  Thank you, sir.
22  Mr. Barrow may have some more.
23  THE WITNESS:  Thank you, sir.
24
25

| Page 171 |
| --- |

1  RE-EXAMINATION
2  BY MR. BARROW:
3  Q    Mr. Turner, I know it's getting late in the
4  day, but I've only got a few left and I think we'll be
5  through.  Okay?
6  **A    Yes, sir.**
7  Q    You indicated to me at the beginning of
8  your deposition that you were an expert in various
9  modalities including accident reconstruction related to
10  braking, skid marks and the application of the Federal
11  Motor Carrier Safety Regulations; correct?
12  **A    Yes.  There's a limitation on the -- that I**
13  **have -- a self-imposed limitation on the accident**
14  **reconstruction aspect as to figuring out, you know,**
15  **skid marks and so forth and how they apply to a crash.**
16  Q    And you were clear about that, but you
17  indicated to me that you do serve as an expert in the
18  application of the FMCSRs?
19  **A    Yes, sir.**
20  Q    Now, Fetter & Son is a for hire interstate
21  motor carrier registered with the Federal Motor Carrier
22  Safety Administration, the FMCSA.  Would you agree with
23  that?
24  **A    Yes, sir.**
25  Q    Right.  And operating liquid bulk tankers.

| Page 172 |
| --- |

1  Would you agree with that?
2  **A    Yes, sir.**
3  Q    And the FMCSA administers the Federal Motor
4  Carrier Safety Regulations; do they not?
5  **A    They do.**
6  Q    And the FMCSRs govern interstate commercial
7  trucking; isn't that right?
8  **A    Well, they govern interstate motor carrier**
9  **transportation.**
10  Q    Right.
11  **A    Yes.**
12  Q    Right.  And I think that's what I said.
13  **A    Yeah.**
14  Q    Interstate commercial.  Right.  Now, in so
15  doing, the FMCSA establish standards for the commercial
16  motor vehicles, their drivers and companies involved in
17  the interstate transportation cargo.  Would you agree?
18  **A    Yes, sir.**
19  Q    All right.  And as the MSCA points out in
20  its FMCSA registration and licensing overview, the
21  agency's responsibilities include monitoring and
22  enforcing compliance with regulations governing both
23  safety and commerce, its focus on both concerns, safety
24  and financial responsibility is reflective in the dual
25  path of its current registration process.  And I'm

Page 173

1    quoting.  Do you agree with that?
2        A    I do.
3        Q    All right.  Now, thus companies who are in
4    need of hiring a motor carrier for interstate,
5    interstate transportation can rely on the fact that if
6    it hires a registered motor carrier in good standing
7    with the agency it is hiring a motor carrier that has
8    met FMCSA standards for both safety and financial
9    responsibility concerns.
10       A    The financial responsibility concerns, yes.
11   As far as safety, as to its application on roadways, on
12   transporting of commercial motor vehicles over the
13   roadways I would agree with that.  However, once he
14   comes off that roadway and he starts pumping into a
15   bulk storage tank, the FMCSR ceases -- it ceases to
16   exist for all intents and purposes.
17       Q    All right.  So the FMCSA has no application
18   once he stops that truck.  Is that your opinion?
19       A    Once he takes it off a public roadway and
20   he's going to go and offload his cargo tank truck, that
21   takes him out of the FMCSR because what a motor carrier
22   does off the roadway with the exception of fueling and
23   some other -- a few exceptions, the FMCSR does not get
24   involved with that.  The FMCSA is not involved with
25   what a trucking company does in their lot or their yard

Page 174

1    or terminal.
2        Q    Are you of the opinion that the Andersons
3    or Golden Eagle had a duty to vet Fetter & Son in
4    addition to determining its for hire -- that it was a
5    for hire motor carrier?
6        A    That's standard practice in the industry
7    where a shipper, a broker, et cetera, or even a
8    manufacturer would vet out a motor carrier before they
9    actually utilize them.  As a matter of fact, that's
10   essentially from CSA 2010 is all about.  It's about
11   getting the tools to industry to be able to look at a
12   motor carrier and their safety performance under what
13   they call BASICS, B-A-S-I-C-S, all capitals.  It allows
14   a shipper to be able to look at it and make
15   determinations if it's a safe operator or not and
16   whether they want to hire them based on their records.
17       Q    Well, what sort of vetting are you opining
18   that the Andersons should have been done with hiring
19   Fetter & Son?
20       A    I think that any motor carrier whether
21   looking at safe stat, you know, what I'll call old
22   school, or the CSA 2010, it gives a clear indicator of
23   how a company operates, so I think that it's important
24   to look at any company as far as how they operate from
25   a day-to-day basis in the motor carrier industry before

Page 175

1    you hire them.
2        Q    And what's the basis for that opinion?
3        A    Again, industry standard.
4        Q    Well, can you refer me to any document
5    evidencing that industry standard other than your
6    opinion based on your years of experience?
7        A    Well, it's the full application and intent
8    of CSA 2010 which is developed by the Federal Motor
9    Carrier Safety Administration.
10       Q    So is it your opinion that CSA '10 requires
11   the Andersons to vet Fetter & Son before hiring them to
12   transport a load?
13       A    It is.
14       Q    And you're saying that that obligation and
15   duty is stated in CSA?
16       A    It's part of the whole entire CSA system,
17   what CSA is all about.  It gives a motor carrier,
18   excuse me, it gives a shipper the opportunity to
19   take -- to examine a motor carrier as to how their
20   performance is on the road and that's the entire intent
21   of the CSA 2010.  And it also weeds out drivers because
22   drivers have scores as well.  So it gives intervention.
23   It allows the Federal Motor Carrier Safety
24   Administration to intervene when a motor carrier is
25   operating unsafely which will be an indicator to a

Page 176

1    would be customer to look at that system and say this
2    motor carrier is an unsafe operator, do I really want
3    to do business with them?
4        Q    And have you found -- a couple of questions
5    then.  I'm familiar with CSA '10.  I don't know any
6    language in CSA '10 that says that a broker or shipper
7    has a duty to vet a for-hire carrier.  Am I wrong in
8    that?
9        A    It's not language.  It's an enforcement
10   tool, but it's utilized by industry by being able to
11   pull the DOT number of the motor carrier and check
12   their SMS results.
13       Q    But as to the duty itself, you can't point
14   me to any document that states that a broker or shipper
15   has that duty?
16       A    No, but there's nothing that says that they
17   have a duty to do that, but it certainly is in their
18   best interest to do that if they're looking to protect
19   their liability.
20       Q    You'd agree with me that the Andersons had
21   no duty to train Fetter & Son drivers or dispatchers?
22       A    No.  They had no duty to train them.
23       Q    Right.  Now, you talked a little bit about
24   the Andersons' obligation to inspect the town of
25   Lexington's facility; correct?

| Page 177 |
|---|

1      A    Yes, sir.
2      Q    Prior to offloading; right?
3          MR. HALL: I thought we talked a lot about
4   that. I'm sorry.
5      Q    Yeah. The town of Lexington was the client
6   of Carus; correct?
7      A    That's correct.
8      Q    Right. Now, let's look at that. All
9   right. Now, what you're saying is the Andes would have
10  to inspect the receiving facility of each client's
11  client. So, for example, if the Andersons had a client
12  base of, let's say, 500 clients, Mr. Turner, and each
13  of those clients has a client base of 200 clients, so
14  what you're saying is the Andersons have to inspect
15  100,000 receiving facilities if there's a shipment
16  made to those facilities; isn't that true?
17          MR. HALL: Objection to the form.
18      A    If they're transporting --
19      Q    You can answer.
20      A    If they're -- do your math. If they're
21  transporting to 100,000 facilities and they're doing 50
22  loads a year, they're doing 5 million loads a year
23  they're going to be the largest bulk carrier in the
24  United States, so I would think that they would be able
25  to support an opportunity to have somebody go out and

| Page 178 |
|---|

1   inspect those facilities to make sure those facilities
2   are acceptable.
3      Q    I'm not asking if they have an opportunity
4   to support it. I'm asking you if they have a duty to
5   do it.
6      A    Again, is there something in writing that
7   says that they have to to the best of my knowledge?
8   No, but in logic speaking, they should, absolutely.
9      Q    And also according to your testimony in
10  this case about the Andersons, it is hypothetical the
11  Andersons would have to routinely inquire as to the
12  status of the changes involving their client's client
13  bases, so that they know who to make inspections to;
14  isn't that true?
15          MR. HALL: Objection to the form.
16      A    I'm just not following you. I'm sorry.
17  It's getting kind of late. I apologize.
18      Q    No. That's okay. That's all right. Now,
19  the MSDS I think you testified had been supplied to the
20  town of Lexington; correct?
21      A    Well, to the best of my knowledge, yes,
22  sir.
23      Q    Right. So the Andersons didn't have an
24  obligation to do that given the fact that Carus had
25  already done that; wouldn't you agree?

| Page 179 |
|---|

1      A    Well, the Andersons because they're
2   manufacturing the chemical under some type of agreement
3   with Carus, they should have provided an MSDS as well
4   to Fetter and Fetter should have made sure that that
5   MSDS gets off to Lexington. If they're dealing
6   directly with Carus, excuse me, with Lexington, then
7   they should have also provided directly to Lexington.
8      Q    If Carus -- who came up with the MSDS for
9   Totalox?
10     A    That would have been Carus. I would think
11  it would have been Carus.
12     Q    Why?
13     A    I'm sorry?
14     Q    Why? Why?
15     A    Why?
16     Q    Assuming you're correct. Why would it have
17  been Carus?
18     A    Because it has their name on top of the
19  MSDS.
20     Q    Why Carus? Why Carus and not the
21  Andersons, for example. Why was it Carus's
22  responsibility to come up with the MSDS?
23     A    Because they're -- as far as I understand
24  they're the owner of that chemical name.
25     Q    Correct. And Carus as the owner of the

| Page 180 |
|---|

1   chemical name had the responsibility to come up with
2   the MSDS. They did that and as you've already
3   testified they provided that MSDS to the town of
4   Lexington prior to the shipment of the chemical that
5   resulted in this accident; isn't that right?
6      A    Yes, sir.
7      Q    All right. So there's no additional
8   obligation on the part of the Andersons to turn around
9   and send the town of Lexington the very same MSDS
10  because that would be redundant; wouldn't it?
11     A    Well, I believe that they still should have
12  provided it because simply they are also a manufacturer
13  of that. There's nothing wrong. Redundancy and safety
14  is a good thing.
15     Q    Sure. What's the basis of your opinion
16  that they had to do that?
17     A    Again, this is just my opinion. They are
18  the manufacturer of the chemical in this particular
19  event.
20     Q    Now, you would agree with me that
21  commercial drivers such as Mr. Weiser who are operating
22  liquid bulk tankers are not expected to be able to
23  identify the soundness of a receiving facility?
24     A    Mr. Weiser?
25     Q    Yes, sir.

46 (Pages 181 to 184)

Page 181

1     A    Not unless he's trained to.
2     Q    And it's common for commercial drivers such
3   as Mr. Weiser to apply air pressure to blow off lines
4   at the completion of offloading; isn't that true?
5     A    I run a safe system, yes, sir.
6         MR. BARROW:  Thank you very much.
7         THE WITNESS:  You're welcome.
8              RE-EXAMINATION
9   BY MR. BARROW:
10    Q    Can I just ask a couple of quick ones.  At
11  the beginning of your deposition, Mr. Turner, we were
12  told by Mr. Hall that you had recently been provided
13  the report from American Engineering Consultants.
14    A    That's correct.
15    Q    Do you know what I'm talking about?
16    A    Yes, sir.
17    Q    Is there anything in this report that
18  changes anything in your report?
19    A    Again, I had a rather quick cursory review
20  of it last night, so I didn't spend a lot of time on
21  it.  Bear with me one second.  I did have a couple of
22  highlights in here.  Bear with me one second.  My
23  papers are all kind of shuffled up in front of me.
24  Here we go.
25    Q    Sure.

Page 182

1     A    Well, other than two things that kind of
2   jumped out at me from a cursory view is that they had
3   stated in here under the potassium permanganate is that
4   the potassium permanganate is also considered a
5   hazardous chemical so special care must be taken when
6   storing and handling it.
7     Q    What page, please?
8     A    Sure.  Page 4.  I apologize.  Page 4,
9   bottom of the paragraph, the first paragraph under
10  potassium permanganate.  Is it necessarily going to
11  change an opinion?  I don't think so, but is it going
12  to cause me to possibly rework an opinion?  That's
13  possible.  I just don't know at this point.  It's new
14  information.
15         Then the second paragraph about two-thirds
16  of the way down it says, "The cost of installing a
17  permanent storage tank and feed system would be
18  approximately $45,000 for the town being responsible
19  for the upkeep and maintenance of the system."  Those
20  are just two things that jumped out at me that I had
21  noted, I highlighted.
22    Q    We were also told that you were recently
23  given Mr. David Patton's deposition transcript to
24  review.
25    A    That's correct.

Page 183

1     Q    Have you done that?
2     A    That's correct.  Again, last night I didn't
3   have time to sufficiently go over it, so it was more or
4   less just scanning the document.
5     Q    Anything in Mr. Patton's deposition that
6   changes any of the opinions you've put in your report
7   or testified to today?
8     A    Well, not at this point.  I mean, I have to
9   have an opportunity to really digest it once I get back
10  from my trip.  I mean, there's things in here that he
11  said that really kind of made me pause for concern that
12  I had seen from again a cursory review.  On page 49 he
13  says, "No, we were always -- we were always" -- then he
14  says he was always told it was harmless.  So he's being
15  told it's harmless from the Carus folks and that right
16  there in and of itself was very concerning to me.
17         Then there was another page that says --
18  it's on page 53 and I'll go ahead and read the question
19  and answer.  It says, "Okay.  So the next time the
20  tanker came or" -- let me back up.  Let me back up.
21  "Do you know if there was any discussion with Carus
22  Corporation or anyone who delivered the Totalox about
23  the setup with the totes being tied together?"
24         And he answers.  He says, "Actually, we had
25  the sales rep from Carus which is at that time Mary

Page 184

1   Ellisor and a guy by the name of -- I think it was
2   Darren from Carus come out and look at it and they said
3   it looked like it would work."
4         Then I had another one that jumped off the
5   page at me.  It says on page 67 down at the bottom, the
6   question was, "How did you find out that the valves
7   were only good for 2 PSI?"
8         And he says, "I did some research with Mary
9   Ellisor and they got that from Carus, the company that
10  actually made the totes."  So the reason that jumps off
11  the page at me is that they knew that it was 2 PSI over
12  at Carus, but they -- and that would lend also to my
13  opinion about the rupture aspect, recognizing the
14  potential for a rupture.  And for Mary Ellisor to say
15  that the system was acceptable, it's -- again, that's
16  where I come into my profit over safety mindset or
17  modus operandi I should say.
18         Now, on page 123 was the last part that
19  jumped out at me.  The question was, "You mentioned
20  earlier that you were told that this chemical Totalox
21  or sodium permanganate was harmless.  Do you recall
22  that testimony?"
23         And the answer was, "Yes."
24         "Question:  Who told you that?"
25         And the answer was, "That came from Darren.

## Page 185

1   They came from Mary Ellisor and it also came from
2   another guy at Carus by the name of -- I don't think I
3   know his name.  I think his name was Bob.  I don't know
4   what his last name was."
5         So those are four of the things that kind
6   of like jump out at me from the onset, but once I get
7   into depth review on this, there may be some changes in
8   my opinions as my report allows me the opportunity at
9   the end of the report.  It states that if new
10  information comes out, I have the opportunity to revise
11  my report and opinions.
12  Q    And how is that going to change the opinion
13  you've ever expressed today?
14  A    I haven't had enough time to digest it,
15  sir, and really think about it quite frankly.
16        MR. BARROW:  Okay.  We're done.  Thank you.
17        (Thereupon, an off-the-record discussion
18  was had.)
19        MR. BARROW:  All right.  Rick, I just
20  wanted -- you said you had a complete copy of his file
21  and we just want to mark his file as an exhibit, so if
22  you'll just hand that to the court reporter.
23        MR. HALL:  Well, that's my copy, so, I
24  mean, that I've given him and I need to take it back
25  with me, so --

## Page 186

1         MR. BARROW:  Well, he was supposed to bring
2   it all with him.
3         MR. HALL:  Well, I know it.  I understand.
4         MR. BARROW:  I'm just curious.  You know, I
5   want to make sure I've got that covered.
6         MR. HALL:  All right.  Well, let me get --
7   can we take a minute and get it back in order?
8         MR. BARROW:  Okay.
9         (Thereupon, marked for
10        identification purposes and
11        attached hereto, Exhibit No. 1.)
12        FURTHER THIS DEPONENT SAITH NOT.
13
14
15
16
17
18
19
20
21
22
23
24
25

## Page 187

1
2
3         WITNESS CERTIFICATE

3         I, SCOTT L. TURNER, do hereby certify that
    I have read and examined the contents of the foregoing
4   pages of record of testimony as given by me at the time
    and place herein aforementioned;
5
        That to the best of my knowledge and belief
6   the foregoing pages are a complete and accurate record
    of all the testimony given by me at said time, except
7   as noted on the errata sheet attached hereto.
8         I have_____ or have not_____ made
    corrections to the attached.
9
10        _____
            SCOTT L. TURNER
11
12  STATE OF _____:
    SS       :
13  COUNTY OF _____:
14        I, _____, NOTARY PUBLIC for the
    County of _____, State of _____,
15  hereby certify that the herein above named personally
    appeared before me this _____ day of _____, 2013, and
16  that I personally witnessed the execution of this
    document for the intents and purpose herein above
17  described.
18        Sworn to and subscribed before me this
    _____ day of _____, 2013.
19
20
        _____
21        Notary Public
22        My commission expires: _____
23
24
25

## Page 188

1         REPORTER'S CERTIFICATE
2   STATE OF TENNESSEE:
            : ss.
3   COUNTY OF HAMILTON:
4         I, Amye B. Guinn, Registered Professional
5   Reporter and Notary Public at Large, do hereby certify
6   that I reported in machine shorthand the deposition of,
7   SCOTT L. TURNER, called as a witness in the
8   above-entitled cause; that the said witness was duly
9   sworn by me; that the foregoing pages, numbered from 1
10  to 188, inclusive, were typed under my personal
11  supervision and constitute a true record of said
12  deposition.
13        I further certify that I am not an attorney
14  or counsel of any of the parties, nor a relative or
15  employee of any attorney or counsel connected with the
16  action, nor financially interested in the outcome of
17  the action.
18        Witness my hand and seal this the 9th day
19  of December, 2013.
20
21
22
        _____
23
        Amye B. Guinn, LCR #324, Registered
24      Professional Reporter and Notary Public
        at Large.  My Commission expires
25      February 22, 2017

Page 189

1                    ERRATA SHEET
2    Witness:  SCOTT L. TURNER
3    Date: _____
4    Page   Line   Change
5    ____  ____   _____
6    ____  ____   _____
7    ____  ____   _____
8    ____  ____   _____
9    ____  ____   _____
10   ____  ____   _____
11   ____  ____   _____
12   ____  ____   _____
13   ____  ____   _____
14   ____  ____   _____
15   ____  ____   _____
16   ____  ____   _____
17   ____  ____   _____
18   ____  ____   _____
19   ____  ____   _____
20   ____  ____   _____
21   ____  ____   _____
22   ____  ____   _____
23   ____  ____   _____
24           _____
25                  Signature