UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
COLUMBIA DIVISION

JOHN WILLIAM MACHIN,

    Plaintiff,

vs.              Case No. 3:12-cv-02675-JFA

FETTER & SON FARMS, LLC,
TERRY J. WEISER, THE ANDERSONS,
formerly known as "GOLDEN
EAGLE PRODUCTS", and
CARUS CORPORATION,

    Defendants.

| | |
|---|---|
| DEPOSITION OF: | DAVID L. DORRITY, MHRD, CDS, CDT |
| DATE: | December 10, 2013 |
| TIME: | 11:00 AM |
| LOCATION: | Merovan Office Center<br>1200 Woodruff Road, A-3<br>Greenville, SC |
| TAKEN BY: | Counsel for the Defendant |
| REPORTED BY: | MARY ALEWINE POSEY,<br>Court Reporter |

A. WILLIAM ROBERTS, JR., & ASSOCIATES

Fast, Accurate & Friendly

| Charleston, SC | Hilton Head, SC | Myrtle Beach, SC |
|---|---|---|
| (843) 722-8414 | (843) 785-3263 | (843) 839-3376 |
| Columbia, SC | Greenville, SC | Charlotte, NC |
| (803) 731-5224 | (864) 234-7030 | (704) 573-3919 |

1  Golden Eagle may be the shipper as well; is that
2  correct?
3      A.   I see them as being equal shippers.
4      Q.   All right.
5      A.   I think it's hard to say that one is
6  superior over the other but they are exerting control
7  at different times.
8           Carus certainly is specifying to Golden
9  Eagle the blend, the formula I think is the way they
10 described it, that this product would be
11 manufactured, they're contracting this out to Golden
12 Eagle to do that, but the packaging and everything is
13 a Carus type brand.  So from that standpoint it's
14 Carus.
15          On the other standpoint, Golden Eagle is a
16 manufacturer in the business of not only maybe
17 manufacturing for Carus, they could have done it for
18 someone else too.  I don't remember if that came up.
19 But they have their own trucking operation that they
20 are shipping out their own cargo.  Which I can see
21 that gives an advantage to them maybe over other
22 manufacturers and distributors, and that could be
23 part of the reason Carus would select them.
24          So it's one of those conditions that it's
25 hard to say categorically it's 100 percent with Carus

1  or 100 percent with Golden Eagle. They're sharing
2  equal control at different times over different parts
3  of the shipment.
4       Q.   How do you define shipper?
5       A.   Well, a shipper is somebody who ships a
6  commodity. For our practical purposes in the
7  trucking industry, it's the person who's tendering
8  the cargo.
9       Q.   So you define a shipper in the context of
10 this case as the person or entity who tenders the
11 cargo?
12      A.   Tenders the cargo.
13           It could also be someone who owns the
14 cargo.
15      Q.   And what do you mean by tenders the cargo?
16      A.   They actually take their forklift or their
17 pumps and put the cargo in the motor carrier's tank
18 or their van trailer.
19      Q.   All right. And where would I find that
20 definition of shipper? Is that codified in any
21 regulation?
22      A.   Well, there are definitions in the National
23 Motor Freight Classification. There's definitions,
24 I'm sure, in other texts depending on what the nature
25 of the text is. But it's the person who is on the

1  see that evidence but I don't know that -- all it
2  would do would be to answer the question, did Carus
3  pay the freight or did Golden Eagle pay the freight.
4      Q.   Okay.  All right.
5           Let's take a look at Opinion Number 2,
6  then.
7           When you say Carus and Golden Eagle did not
8  investigate the regulatory and safety qualifications
9  of Fetter & Son before choosing them as their
10 carrier, why is that important to you?
11     A.   Shippers have a duty to make sure they use
12 safe motor carriers, motor carriers that have a
13 positive safety record to protect the public, because
14 that's something they can choose right from the
15 get-go.  Also make sure that they have drivers that
16 are responsive to regulatory compliance at least, and
17 we'll talk a little bit about, in the future here --
18 about drivers being properly and adequately safety
19 trained.
20          THE WITNESS:  Mr. Barrow, would this be a
21 good point since we're starting a new topic here?
22          MR. BARROW:  Sure.  Do you want to take a
23 break?
24          THE WITNESS:  I want to answer that
25 question.  Could we do that just a minute?

1              MR. BARROW:  Absolutely.
2              (A recess transpired.)
3     BY MR. BARROW:
4         Q.   All right, Mr. Dorrity, you were about to
5     tell me about Opinion Number 2?
6         A.   Yes, sir.
7         Q.   And that being that Carus and Golden Eagle
8     didn't investigate the regulatory and safety
9     qualifications of Fetter & Son before choosing them
10    as a carrier.
11             And you had indicated to me that shippers
12    have a duty to use safe motor carriers; is that
13    correct?
14        A.   Yes, sir.
15        Q.   And my question to you is:  Who defines
16    that duty for shippers?  Where will I go to determine
17    how the duty to use safe motor carriers by shippers
18    is defined?
19             MR. HALL:  Objection.
20             Go ahead.
21             THE WITNESS:  There is no regulation that
22    addresses this.
23    BY MR. BARROW:
24        Q.   Okay.
25        A.   This is a standard that's been building

1  within our industry and it, believe it or not, was
2  first started -- I first began to hear it from
3  lawyers, defense lawyers, in conferences, and I began
4  to read about it in Transport Topics, which is a
5  publication of the American Trucking Association.
6         I've provided a couple of examples of this
7  idea and standard both by insurance companies and
8  also by logistics magazines, trucking kind of
9  magazines.
10        So it's embodied in what -- if you weren't
11 in this industry -- a juror, for example, is not
12 going to know this information because they're not
13 paying attention to the news.  They're not reading
14 the right sources and they are not experienced in
15 working in our industry.  And they're not paying
16 attention also to how the law is beginning to settle
17 this issue, about how judges and juries are beginning
18 to decide that, yes, shippers are in charge of who
19 they select, they can select a good one or they can
20 select a bad one, and if they've got information at
21 their fingertips it behooves them to go ahead and
22 utilize that.  And I don't mean just read it and say
23 I've read it.
24      Q.    Sure.
25      A.    It means to do something with it.

1   A.   I don't -- I don't know.  I could research
2   it and get it back to you.
3   Q.   Okay.  What Fourth Circuit -- US Fourth
4   Circuit case law imposes this duty that we're
5   discussing on shippers?
6   A.   I don't know.  You're going to win on all
7   of these lines of questions because I'm just not
8   prepared to answer that.
9   Q.   That's okay.  Just curious if you knew
10  something I didn't.  That's why I was asking.
11  A.   No.  But I imagine that's something we will
12  be developing.  I imagine that Mr. Hall and I will be
13  having that discussion as far as -- as he prepares
14  for trial.
15  Q.   Okay.  Now, you gave me the CNA article
16  that says, emerging issue, shippers negligent in
17  hiring of motor carriers, and that's part of the
18  basis for your opinion that this duty exists,
19  correct?
20  A.   Yes, sir.
21  Q.   All right.  And how old is that -- it's a
22  two-page document -- how old is that document?  Do
23  you remember?  I was looking for that but I couldn't
24  find it.
25       Well, now, wait a minute.  It says

1  copyright 2011.
2          Does that sound about right?
3      A.  Yes, sir.
4      Q.  Okay.
5      A.  Well, CNA is copyrighted 2011. I don't
6  know if the article is copyrighted or it's just
7  they're copyrighting their name or something.
8      Q.  I couldn't tell.
9      A.  I mean, CNA is part of Allstate. I mean,
10 it's that big conglomerate.
11     Q.  Yes.
12     A.  I mean, I've worked for them. I mean,
13 you've probably worked for them.
14     Q.  Yes.
15     A.  And I'm not saying anything adverse of CNA,
16 please, but I'm just simply saying that other
17 insurance companies -- I don't have it handy but I
18 have done work for other companies that you've also
19 worked for and they're all singing the same song.
20     Q.  All right. So this article is an
21 indication that a shipper has a duty to hire, as you
22 have indicated, a safe motor carrier to transport the
23 owner's product. Would that be correct?
24     A.  I wouldn't phrase it exactly that way.
25     Q.  Okay. How would you phrase it?